**AFFIRM; and Opinion Filed October 10, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-00871-CV

## IN THE INTEREST OF D.W., J.L., V.T., R.W., KE.W., KA.W., B.W., AND A.W., MINOR CHILDREN

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 12-1043-W**

## OPINION

Before Chief Justice Wright and Justices Fillmore and Evans
Opinion by Justice Fillmore

T.W. appeals the termination of her parental rights to eight of her children, D.W., J.L., V.T., R.W., Ke.W., Ka.W., B.W., and A.W., contending the evidence was factually insufficient to support the jury's findings that termination is in the best interest of the children.[1] We affirm the trial court's judgment.

### Background[2]

On September 17, 2012, Angel Martin, who was an investigator with the Texas Department of Family & Protective Services (the Department), received a referral that T.W. was

---

[1] In addition to the brief filed by T.W.'s counsel, T.W. has submitted a *pro se* "Amendment Brief." There is no provision in Texas law for hybrid representation enabling both an appellant and her attorney to file separate briefs. *See Posner v. Dallas Cnty. Child Welfare*, 784 S.W.2d 585, 588 (Tex. App.—Eastland 1990, writ denied) (per curiam); *see also In re R.A.P.*, No. 14-06-00109-CV, 2007 WL 174376, at *1 n.1 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (mem. op.). Therefore T.W.'s *pro se* brief presents nothing for our review. *See Posner*, 784 S.W.2d at 588.

[2] J.L.'s father died prior to trial. M.W., who was the father of the five youngest children, L.W., who was D.W.'s father, and V.T., Sr., who was V.T.'s father, did not appear at trial on February 24, 2014. Prior to trial of the Department's petition to terminate T.W.'s parental rights, the trial court heard evidence and found M.W.'s, L.W.'s, and V.T., Sr.'s parental rights should be terminated.

living in a shelter, was running away from an abusive husband, and had eight children. Martin was told that T.W. had reported she had mental health issues that were not being treated. Martin went to the shelter to interview T.W. about where she was going to live and to determine whether there were services that could be offered to her. T.W. was not at the shelter and did not answer her telephone. When Martin was unable to locate T.W., she attempted to locate the children. The oldest three children were enrolled in school, but were absent that day.

On September 19, 2012, Martin received a referral that T.W. had left her eight children, ranging in age from five days old to nine years old, in a van parked at Children's Medical Center. Chnibre Yarbrough, a security officer at Children's Medical Center, testified T.W. did not return for over an hour after security was contacted by an individual who saw the children alone in the van. By that time, the door to the van had been opened with a "Slim Jim" and the children had been taken into Children's Medical Center. A security guard remained at the van and directed T.W. into Children's Medical Center when she returned.

Yarbrough testified T.W. told him her friend "Marie" or "Maria" had agreed to watch the children while T.W. was seeking treatment in the adjacent Parkland Hospital. T.W. indicated "Marie" had said she was on her way to the van and that T.W. could go into Parkland. T.W. told Martin that her friend "Shanasty" had agreed to watch the children while T.W. was being treated in Parkland for bleeding following the birth of her child. Neither Martin nor Yarbrough were able to locate the person T.W. claimed was to watch the children.

Yarbrough testified the children were dirty and the younger ones needed to have their diapers changed. The children had fungal infections on their heads and were missing patches of hair. Although T.W. claimed the three oldest children were not in school because they had diarrhea, none of the children complained about a stomach illness and the medical staff at Children's Medical Center told Martin that none of the children had diarrhea.

T.W. told Martin she was "running away" from her abusive husband, M.W.  T.W. said M.W. choked her while she was pregnant and that she had obtained a protective order against him.  T.W. also told Martin that, based on a complaint filed by M.W.'s family with the Arkansas "CPS," the children had been removed from her care in Arkansas and placed into foster care. T.W. retained an attorney, and the children were returned to her.

The Department removed the children from T.W.'s care and contacted one of T.W.'s cousins about caring for the children.  After the cousin declined to take the children, T.W. refused to provide the names of any other relatives who might take the children and refused to cooperate with the Department's efforts to place the children.  The children were placed into foster care.  When the children were transported to their foster homes, the older children reported fighting between their parents.

On September 20, 2012, the Department filed its original petition for protection of the children, for conservatorship, and for the termination of T.W.'s and the children's fathers' parental rights.  At a hearing on October 17, 2012, the trial court ordered T.W. to complete parenting classes, a psychological evaluation, and individual counseling and to comply with any recommendations she received based on her participation in these services.  Further, because there was evidence of domestic violence, the trial court ordered T.W. to obtain domestic violence counseling and ordered M.W., T.W.'s husband and the father of the five youngest children, to complete a Batterer's Intervention Prevention Program.

Katrina Trotman, a conservatorship specialist with the Department, was assigned to the case following the hearing.  Trotman testified T.W. was very hostile in her communications with the Department and initially refused to participate in any of the court-ordered services.  T.W. eventually began to participate in the ordered services and, on March 10, 2013, completed a parenting class in Arkansas.  According to Trotman, it was not clear this class was comparable to

the class the trial court ordered T.W. to attend in Texas. T.W. also underwent a psychological evaluation in Arkansas. Trotman discussed T.W.'s psychological evaluation with the psychologist, and testified the psychologist recommended that T.W. participate in counseling. However, T.W. failed to consistently attend her counseling appointments and was discharged from counseling due to her failure to participate.

According to Trotman, the psychological evaluation showed that T.W. had some mental health issues and recommended a psychiatric evaluation as well as medication for emotional disorders. In Trotman's opinion, it is a danger to a child for a parent to have an untreated emotional disorder or mental illness. Trotman testified T.W.'s behavior was erratic and she had not shown the emotional stability needed to care for the children.

The trial court ordered that T.W. could visit the children for two hours every week at the Department's offices. J.L.'s father was killed prior to the first scheduled visit. Martin told T.W. the Department had contacted a therapist to talk to J.L. about the situation because they wanted J.L. to have some help in understanding what had happened to his father. T.W. indicated she would make the decisions for her children. As T.W. approached the children, she took out a cellphone and showed them something. Martin saw J.L. get a funny look on his face. T.W. would not tell Martin what was on her phone, but J.L. later told Martin what he had seen.

T.W. did not consistently attend the scheduled visits. According to Trotman, it was traumatic for the children when T.W. failed to come to a scheduled visit. Trotman testified T.W. was arrested for burglary while the children were in the Department's care. For several months, T.W. failed to attend any visits because she was incarcerated in Arkansas. After she was released from jail, T.W. saw the children fairly regularly for several months. Then T.W. failed to visit the children for the next three months. M.W. attended some of the visits with T.W., and

–4–

Trotman was concerned that T.W. had an ongoing relationship with a man she had alleged abused her.

Trotman described T.W.'s visits with the children as "very chaotic," with the child who was the "squeaky wheel" receiving the most attention. During one visit, T.W. attempted to use a "talking stick," a technique taught in parenting classes, to control her interactions with the children. However, the attempt was unsuccessful, and T.W. did not attempt to use the "talking stick" in subsequent visits.

During one visit, T.W. gave D.W. and R.W. cellphones, which the children were not allowed to have. T.W. communicated with D.W. on the cellphone, and D.W. disclosed the location of her foster home and her school. As a result, the Department was required to move D.W. to a different foster home. Although T.W. was told the children were not allowed to have cellphones, she again gave the cellphone to D.W. during a subsequent visit.

According to Trotman, T.W. has become irate during visits with the children and has "cursed out" Trotman and several of her coworkers. During one visit, T.W. became angry, stormed out of the room with the baby in her arms, and kicked open a door in the office. During another visit, T.W. called 911 when she was unable to soothe her crying infant. According to Kathryn Sieling, a volunteer for Court Appointed Special Advocates (CASA), who observed the visit, T.W. did not take responsibility for caring for the infant. Rather, T.W. became confrontational and said the baby would not be crying if she had not been taken away from T.W. When a staff member took the infant from T.W., the baby quieted almost immediately. Emergency personnel responded to the 911 call and determined there was nothing wrong with the infant.

T.W. became pregnant with her ninth child after the children had been removed from her care. After D.W. learned at school that T.W. was pregnant and in jail, Trotman believed she had

to tell the other children. Trotman testified that T.W. had told J.L. she was unable to have any more children. J.L. and V.T. became very angry when Trotman told them that T.W. was pregnant, and J.L. accused Trotman of lying

When the children were removed from T.W.'s care, D.W. was nine, J.L. was eight, and V.T. was six. D.W., J.L. and V.T. are the oldest of the children and are receiving counseling. J.L. and V.T. are also seeing a psychiatrist, Dr. Fernando Siles, for "medication management" because they had extreme behavioral problems when they were removed from T.W.'s care. According to Siles, J.L. was angry, defiant, oppositional, and had problems with lying and stealing. J.L. was also exposed to emotional trauma when T.W. showed him pictures of his father in a casket. Siles placed J.L. on medication for anger, for "ADHD," and to help him sleep. In August 2013, J.L. began "isolating" and having crying spells and excessive anxiety after learning T.W. was pregnant. Siles prescribed an anti-depression medication for J.L. for approximately three months. Siles also noted that someone was telling J.L. about upcoming court hearings and that those hearings involved parental rights.

According to Siles, V.T. is a very strong-willed, very angry child. Siles is concerned that V.T. has thoughts about wanting to hurt himself or other people with knives or weapons. V.T. is "going through a lot of turmoil" and needs a resolution to the custody issue. Siles prescribed V.T. medication for anger, to help him focus, and to help him sleep. V.T. also took medication for depression for a short period of time, but the medication was discontinued due to V.T.'s aggressive behavior. Siles then increased the dosage of the medication that helped V.T. control his anger.

Siles attempted to be "very conservative" and not prescribe any medication J.L. and V.T. did not need. In Siles's opinion, the medications were medically necessary for J.L. and V.T. and were in the children's best interest. T.W. objected to the children receiving medication and,

according to Trotman, told J.L. and V.T. to refuse the medications and to call 911 if their foster parents tried to make them take it. T.W. also told K.W. not to take medication for her serious allergies. Both J.L. and V.T. refused to take their medications for a time, but have resumed taking them. Trotman testified that V.T.'s behavior improved when he was taking his medications. On October 18, 2013, Siles recommended that J.L.'s and V.T.'s visits with T.W. be "discontinued for the time being, due to the worsening of the [children's] behavior after visitation."

Frank Araiza, a therapist, testified he began treating J.L and V.T. in December 2012. According to Araiza, J.L. is a "very sad individual" whose issues include separation from T.W. and being in foster care. V.T. is a "very angry kid" and "very aggressive." The source of this anger is likely being in foster care and being away from his family. Araiza testified there had been a "lot of misconception or miscommunication" regarding the children's visits with T.W. and promises that the children were "going home, but it had to be up to the judge." According to Araiza "someone was telling them they were going to go home" and the children were "misinformed about going home or [T.W.] doing the things she needed to" for them to go home. Arazia believed that T.W. was telling the children that she was "doing what she was supposed to be doing."

Arazia testified J.L. and V.T. were upset about T.W. being pregnant. T.W. did not tell the children that she was pregnant and "it was like deception for them" when they learned she was pregnant. Based on statements J.L and V.T. made, Araiza believes the children were possibly exposed to domestic violence. Trotman also testified that V.T. made statements such as he was going to "beat [J.L.] like daddy beat momma." According to Araiza, witnessing domestic violence would be a traumatic experience for a child and could also be the source of J.L's depression and V.T.'s anger. Araiza also believed it would be detrimental to J.L. if T.W. showed

him a picture of his father in a casket.  Rather, J.L should have been told about his father's death in a different way.

Araiza testified that J.L. and V.T. have "made progress."  However, J.L had an episode of depression, and V.T. is aggressive and has hit J.L. as well as children at school.  V.T. also makes verbal threats toward J.L.  J.L and V.T. are in the same foster home, and Araiza believes the home has good structure and is supportive.  Araiza also believes the medications that J.L and V.T. are taking have addressed some of the children's emotional issues.  Trotman testified the Department would continue to provide therapy for the boys if it was granted conservatorship.  Araiza does not believe J.L and V.T. should be returned to T.W.

Trotman testified that, after a home study, D.W. was placed with her paternal grandmother in Arkansas.  T.W. did not agree with the placement.  T.W. went to D.W.'s school in Arkansas and filed complaints against D.W.'s grandmother with the Arkansas "CPS."  The police also came to D.W.'s grandmother's home on several occasions based on complaints made by T.W.  D.W.'s grandmother became concerned she would lose her job due to T.W.'s complaints and requested the Department resume D.W.'s care.

Rose Obaze, a psychoanalyst, provides therapy for D.W.  Obaze initially treated D.W. for two months in 2012 after D.W. was placed in a foster home with which Obaze worked.  D.W. was removed from the home after T.W. began "stalking" the home and being disruptive.  Obaze resumed treating D.W. after her grandmother returned her to the Department's care.

Obaze testified D.W. has behavior problems such as being rude and disruptive.  According to Obaze, D.W. is very focused on T.W.  D.W. is the oldest child and is "parentified," meaning she is more adult-like and more responsible for other people.  D.W. wants to be the parent to the other children and has admitted she helps T.W with her siblings.  D.W. craves the

attention of peers, but does not know how to interact appropriately with them. D.W. is bossy and demanding and has not had an opportunity to "be a kid." D.W. once threatened to hurt herself.

T.W.'s failure to consistently visit the children has been disruptive for D.S. When T.W. did not visit for several months, D.W. decided she wanted to live with her grandmother and stated she was not going to "act out" and was going to do what she "was supposed to do." This all changed when T.W. resumed her visits with the children. Now, D.W. wants to go home with T.W. D.W.'s old behaviors, such as being disruptive in school, have escalated. D.W. has been diagnosed with "ADHD," but has not been treated because T.W. opposes D.W. being placed on medication. D.W. is unable to concentrate and focus. This is affecting D.W.'s grades at school, and she is failing two classes.

Obaze does not believe that D.W. can be successful if she does not learn to follow the rules. D.W.'s grandmother was willing to take conservatorship of D.W. if T.W.'s parental rights were terminated and planned to adopt D.W. Obaze supported the Department's plan to place D.W. with her grandmother because it would give D.W. an opportunity to "be a kid." Obaze believes that D.W. needs to be in an environment where she can develop social skills and focus on herself, rather than on her siblings and T.W. Although D.W. could live with one or two of her siblings, Obaze does not believe that D.W. should live with all her siblings because she would end up being the parent. Obaze believed it would be in D.W.'s best interest for T.W.'s parental rights to be terminated.

Trotman testified the Department planned to seek permanent placements for the children to provide them with some type of stability. According to Trotman, stability for a child is not only having a home to live in, but having someone who is going to be caring and nurturing and who will work with them educationally, teach them responsibility, and give them the love they need. The Department's plan for J.L. is adoption, but the Department would, following a home

study, consider placing J.L. with his paternal grandparents. V.T.'s foster home has not committed to adopting him, but has committed to allowing him to stay in the home. According to Trotman, it might not be possible for J.L. and V.T. to stay in the same home because of their relationship. It would be detrimental for the boys to stay together because V.T. is "really violent" toward J.L.

At the time of trial, R.W., Ke.W., and Ka.W. had been placed with M.W.'s aunt for approximately six months and were doing well.[3] T.W. opposed this placement. B.W. and A.W. were placed in foster homes, and the foster parents were willing to adopt them.

Trotman testified J.L. is in special education, but is doing well in his classes. None of the other children have any special developmental needs and none of the children have any physical limitations. According to Trotman, although the Department would like to place the children in one home, it could be difficult to find a home that can care for all eight children. Further, the siblings do not interact well all the time. Regardless of the final placements, the Department would encourage the siblings to continue to have contact with each other. In Trotman's opinion, termination of T.W.'s parental rights was in the best interest of the children.

Although T.W. was at the courthouse on the first day of trial, she left before voir dire began. Ginger Jones, a volunteer for CASA, testified she saw T.W. walking away from the courthouse and informed the Department's and T.W.'s attorneys that T.W. had left. At T.W.'s attorney's request, Jones found T.W. and requested that she return to the courthouse. T.W. nodded that she would do so, but did not return and was not present the first three days of trial.

Jones testified her role was to visit the children in their foster homes to determine how they were doing and to communicate with any other individuals, such as doctors, psychologists,

---

[3] In her brief, T.W. cites to portions of the clerk's record post-dating the trial relating to this placement. This evidence was not before the jury, and we will not consider it on appeal.

–10–

or lawyers, involved in the case. During her communications with T.W., T.W. was usually very angry and yelling about the courts and the lawyers. T.W. denied she had done anything wrong and did not believe anyone had the right to take her children. Rather than completing her court-ordered services, T.W. fought everything and everyone "at every turn." T.W. did not follow the rules and caused great disruptions during every visit with the children. T.W. also lied about many things.

According to Jones, the uncertainty about where they would be living bothered some of the children. J.L. and V.T. have not unpacked their clothes at their foster home. Rather, they keep their clothes in a box because they are planning to go home. Jones testified the children needed a stable, safe environment where their needs are provided for, they can attend school and be helped with their school work, and they receive not only the basic necessities but unconditional love. Jones expected this home to be free of violence and chaos. In Jones's opinion, T.W. has put her interest above her children "all the time" and could not provide this type of home for the children. Jones testified CASA recommended that T.W.'s parental rights be terminated.

Sieling testified she was appointed by the trial court to the case, along with Jones, because there were so many children involved. Sieling does not believe that T.W. has taken responsibility for her problems and blames everyone else for her situation. As a CASA volunteer, Sieling is tasked to investigate all areas of the case and try to determine what is in the best interest of the children. Sieling has never "felt comfortable enough" to recommend the children be returned to T.W. Based on Sieling's observations of T.W.'s visits with the children and things the children have told her, Sieling does not believe it is in the best interest of the children to be returned to T.W.

T.W. attended the fourth day of trial, and the trial court granted her request to reopen the evidence and allowed her to testify. T.W. testified she was in court on the first day of trial, but understood nothing was going to happen. She was under stress and did not feel well enough to attend court. She stated, "I love me," and "I wasn't finna pass out in that courtroom." T.W. stated she had been sick with bronchitis and a stomach virus and had "to take care of [her] health." T.W. had not, however, sought any medical attention during the first three days of trial.

T.W. testified she and her seven oldest children came to Dallas from Arkansas in August 2012. T.W. was pregnant at the time. According to T.W., she was not trying to escape M.W. when she came to Dallas. Rather, she came to Dallas because, when the children were in foster care in Arkansas, R.W. got a fungus on his head that had spread to some of the other children. The children needed medical treatment that she could not obtain in Arkansas. T.W.'s cousin and his girlfriend offered to let the family stay with them and to help T.W. obtain medical treatment for the children. The fungus continued to spread between the children and, after a few days, T.W.'s cousin's girlfriend asked the family to leave. T.W. and the children went to live in the Family Place shelter.

On September 15, 2012, T.W. gave birth to A.W. T.W. testified that, on September 19, 2012, she was hemorrhaging and asked a worker at the shelter for a ride to the hospital. No one at the shelter could take T.W. to the hospital and she had "no choice" but to drive herself to the hospital with her eight children. According to T.W., the older children were not in school because they were sick. T.W. took all of their possessions with them because the shelter was going to spray her room for bed bugs.

T.W. testified she parked in the parking garage at Children's Medical Center. According to T.W., she felt as if she would "pass out," and she "wasn't fit" to take the children into the hospital. She rolled down the windows of the van and placed the keys in the glove box. She

–12–

instructed D.W. that her friend "Shauinty" was on the way and to call 911 and say that her mother needed help. She then told D.W. that she was "about to get a security guard." T.W. left the children in the van "so that she could go see the security guard or the police or someone to help get them out." She found a security guard and returned to the van, but the children had already been removed from the vehicle. T.W. testified that she was away from the van for approximately five or six minutes.

After the children were removed from her care, T.W. returned to Arkansas. Throughout the time the children were in the care of the Department, T.W. has traveled back and forth between Texas and Arkansas. When she was in Arkansas, T.W. lived with her father, her sisters and brothers, in a hotel, and in her home. However, her home in Arkansas has been vandalized and is no longer habitable.

T.W. denied being offered any services by the Department after the children were removed and did not recall being ordered by the trial court to participate in any services. She claimed the Department did not tell her for six months what she needed to do in order for the children to be returned to her care. She then underwent a psychological evaluation and attended parenting classes. She also went to several counseling sessions. T.W. believes she has done everything she needs to do to have the children returned to her.

T.W. testified she missed visits with the children during the time she was incarcerated and when "probation got in the way." J.L.'s father was killed shortly after the children were removed from T.W.'s care. She took a picture of J.L.'s father's body at the wake using the camera on her cellphone. She did not recall if she showed J.L. that picture or what she showed J.L. on her cellphone during her next visit with him. She told J.L. that his father had died.

T.W. admitted she gave D.W. a cellphone twice during visits, but denied being told that D.W. having a cellphone was against the rules. T.W. allows her children to have material things,

and D.W. asked for the cellphone. T.W. also admitted that, while D.W. was living with her grandmother, T.W. called "Consumer Affairs" based on things that D.W. told her.

According to T.W., she called 911 during one of her visits with the children because the baby has a milk allergy and was crying a lot. T.W. called 911 because the baby "wasn't acting her normal self," not because the baby was crying. T.W. admitted the baby was fine by the time the emergency personnel left.

T.W. admitted she was on probation in Arkansas for convictions for possession of a defaced firearm, aggravated assault, forgery, and two felony theft-of-property offenses. According to T.W., she would be released from probation after she finished paying $2,200 in restitution. T.W. also admitted she had been charged with aggravated assault after she cut D.W.'s father with a knife during a physical altercation. T.W. testified she was defending herself and the charge was dismissed. Trotman, who had spoken with T.W.'s probation officer, expressed concern that, under the terms of her probation, T.W. could not live in Texas.

In December 2013, with the assistance of a "Section 8" voucher she received when she was discharged from the shelter, T.W. rented a four bedroom house in Dallas to share with the children. However, the lease that T.W. showed to Trotman expired in January of 2014, and it was unclear how long T.W. would continue to receive assistance to rent the house. Further, T.W.'s probation officer required her to live with a family member while she was in Dallas so that he could locate her.

Approximately one month before trial, T.W. obtained a part-time job in Dallas at Brentwood Health Care. Her employer did not know she had been convicted of theft, aggravated assault, and possession of a defaced firearm. In addition to the income she was earning, T.W. received benefits for some of the children based on M.W.'s status as a disabled veteran. She did

not know if the termination of M.W.'s parental rights would affect her ability to collect those benefits. T.W. testified she would also receive "death benefits" for J.L.

T.W. planned for the five oldest children to attend public school and the three youngest children to attend daycare. T.W. had made arrangements with a daycare provider to care for the three youngest children while she was at work and with a neighbor for additional child care services. T.W., however, worked evenings and had not determined the cost of care for the older children while she worked evenings. Further, T.W.'s income did not appear to be sufficient to pay the child care rates she had negotiated with the daycare provider for the care of the younger children.

T.W. testified she was still married to M.W. They are separated, but trying to reconcile. T.W. admitted M.W. had been "violent" toward her and that she obtained a protective order against him in 2010. According to T.W., M.W. is a veteran with "PTSD" and "with the state of mind he is in from time to time, [they are] not able to be around each other." At the time of trial, M.W. was in jail in Arkansas.

T.W. admitted she had "cursed a lot throughout this process" and had not been on her best behavior since the children were removed from her care. She believes the children are under stress because they are not with her and does not believe she has played any role in her children being stressed. T.W. suffers from depression, but does not take medication for her condition. She also does not want the children to take psychotropic medicine for any condition they have because she believes it adversely affects them.

It was undisputed the children loved T.W. and were bonded with T.W. The older children, D.W., J.L., V.T., and R.W., told several people they wanted to go home with T.W. T.W. testified she was a good mother and just made a mistake. She requested the children be returned to her.

–15–

During closing arguments, the attorney ad litem for the children and the State's attorney requested that T.W.'s parental rights be terminated and the Department be named the conservator of the children. T.W.'s attorney requested the children be returned to her. Ten members of the jury found termination grounds based on endangerment (sections 161.001(1)(D) and (E) of the family code) and failure to follow a court-ordered reunification plan (section 161.001(1)(O) of the family code) and that termination of the parent-child relationship between T.W. and each child was in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O), (2) (West 2014). The trial court ordered the termination of the parent-child relationship between T.W. and each child.

## Analysis

A trial court may terminate the parent-child relationship if the fact finder determines (1) a parent committed one or more of the enumerated statutory acts in section 161.001(1) of the family code, and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). In her sole issue on appeal, T.W. challenges the factual sufficiency of the evidence to support the jury's findings that termination of her parental rights is in the best interest of the children.

### *Standard of Review*

Because the fundamental liberty interest of a parent in the care, custody, and control of her child is one of constitutional dimensions, *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000), involuntary parental termination proceedings must be strictly scrutinized. *In re K.M.L.*, No. 12-0728, 2014 WL 4252270, at *7 (Tex. Aug. 29, 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).[4] In parental termination cases, due process requires the petitioner to justify termination

---

[4] However, parental rights are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."); *see also In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

–16–

by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982)). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *In re E.N.C.*, 384 S.W.3d at 802.

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). When conducting a factual sufficiency review of a decree terminating parental rights, we give due deference to the jury's findings and do not supplant the jury's judgment with our own. *Id.* at 503; *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). We determine whether, on the entire record, "the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *In re A.B.*, 437 S.W.3d at 502 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re A.B.*, 437 S.W.3d at 503 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

*Best Interest of the Child*

A judicial determination of the "best interest" of a child is "not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm. Rather, 'best interest' is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (orig. proceeding) (plurality op.). In reviewing a jury's best interest finding, we consider several nonexclusive factors, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical

danger to the child now and in the future; (4) the parental abilities of the person seeking custody; (5) the programs available to assist the person seeking custody in promoting the best interest of the child; (6) plans for the child by the person seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (in reviewing a best-interest finding, appellate court "consider[s], among other evidence, the *Holley* factors"). These factors are not exhaustive. *In re C.H.*, 89 S.W.3d at 27. Some of the listed factors may be inapplicable to a case and other factors not on the list may also be considered when appropriate. *Id.* The absence of evidence about some of the factors would not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in the best interest of the child, particularly if the evidence was undisputed that the parental relationship endangered the safety of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Evidence of one the predicate acts for termination under section 161.001(1) may also be relevant to determining the best interest of the child. *Id.* at 27–28.

While there is a strong presumption that a child's best interest is served by maintaining the parent-child relationship, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing TEX. FAM. CODE ANN. § 153.131(b) (West 2014)), the prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West 2014). The statutory factors to be considered in determining the best interest of the child are (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated

harm after the initial report and intervention by the Department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, or other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b).

In answering the best interest questions in the jury charge, the jury was instructed to consider both the statutory and *Holley* factors. On appeal, T.W. focuses her factual sufficiency argument solely on the *Holley* factors. However, because the record contains relevant evidence regarding the remaining factors, we shall consider them in our analysis.

<u>The Desires of the Children</u>

The first *Holley* factor is the desires of the children. None of the children testified at trial, and a number of the children were too young to express their desires. The four oldest children, D.W., J.L., V.T., and R.W., who were age nine, eight, six, and five, respectively, when they were removed from T.W.'s care, told various people that they wanted to live with T.W. Even so, a child's preference should not be considered absent a showing of sufficient maturity, *In re A.R.*, 236 S.W.3d 460, 480 (Tex. App.—Dallas 2007, no pet.) (op. on reh'g), and there was no

indication that any of the children were sufficiently mature to express a preference as to their placement. Further, although the children appeared bonded with T.W. during visits, evidence that a child loves a parent and enjoys visits is only marginally relevant to a best interest finding. *In re S.C.*, No. 07-14-00026-CV, 2014 WL 3697059, at *4 (Tex. App.—Amarillo July 23, 2014, no pet.) (mem. op.); *In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.). We conclude on the record of this case that this factor is neutral, weighing neither in favor of nor against termination of parental rights.

Emotional and Physical Needs of the Children and Parenting Abilities

The second and fourth *Holley* factors are related. The second factor considers the children's current and future physical and emotional needs, while the fourth factor considers the parental abilities of the person seeking custody.

The need for stability and permanence is an important consideration for a child's present and future physical and emotional needs. *In re J.D.B.*, 435 S.W.3d 452, 468 (Tex. App.—Dallas 2014, no pet.); *In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("Stability is important in a child's emotional and physical development."). Trotman and Jones testified the children needed a stable, loving environment. However, the children's environment was not stable prior to their removal from T.W.'s care. The children witnessed domestic violence between T.W. and M.W. In Arkansas, the children were removed from T.W.'s care for a short period of time. Shortly after the children were returned to her care, T.W. brought the children to Dallas. The family lived with T.W.'s cousin and his girlfriend for a few days and then moved into a shelter. The children were removed from T.W.'s care after she left them alone in the van at Children's Medical Center.

T.W. also did not foster stability for her children while they were in the Department's care. T.W. did not attend all scheduled visits with the children, and the children were upset

when she was not there. T.W. gave a cellphone to D.W. and, after learning the location of D.W.'s foster home, disrupted the home, requiring the Department to move D.W. to a new foster home. After D.W. was placed with her grandmother, T.W. filed complaints against D.W.'s grandmother with the police and "CPS" in Arkansas. T.W.'s conduct was so disruptive that D.W.'s grandmother returned D.W. to the Department's care.

T.W. lied to her children about being pregnant with her ninth child. J.L and V.T. viewed this conduct as deceptive, and J.L became depressed after learning the truth. T.W. also misled the children by telling them she was doing everything that was required of her and they would be coming home soon. Believing they would soon be returning to T.W., J.L. and V.T. refused to unpack their clothes in their foster home.

T.W. informed J.L. about his father's death by showing him a picture of his father in a casket. Siles testified J.L. was traumatized by this, and Arazia testified that showing a young child a picture of his father in a casket was not the appropriate way to inform the child of his father's death.

Siles testified that J.L. and V.T. had serious behavioral issues, the medications he prescribed helped them, and the medications were in the children's best interest. T.W. objected to the prescribed medications and instructed J.L. and V.T. to refuse to take the medications and to call 911 if their foster parents attempted to make them take the medications. Both J.L. and V.T. refused their medications for a short period, causing their behavior to deteriorate. T.W. objected to D.W. receiving medication for "ADHD." D.W. was having difficulty focusing and was failing two classes in school.

T.W.'s visits with the children were chaotic, and the children's behavior deteriorated following the visits. T.W. lost her temper during one visit and kicked a door while holding her infant. In another visit, she called 911 because she could not soothe her baby, and the children

saw emergency personnel responding to the call. T.W. did not seem to be able to apply the skills she learned in her parenting class to her interactions with the children. In October 2013, Siles recommended that J.L.'s and V.T.'s visits with T.W. stop due to the adverse effects of the visits on the children's behavior. *See In re S.Y.*, 435 S.W.3d 923, 930 (Tex. App.—Dallas 2014, no pet.) (considering mother's failure to demonstrate improved parenting skills in best interest analysis); *In re C.N.S.*, No. 14-14-00301-CV, 2014 WL 3887722, at *10 (Tex. App.—Houston [14th Dist.] Aug. 7, 2014, no pet.) (mem. op.).

T.W. failed to complete all the court-ordered services. She was hostile and aggressive throughout the time the children were in the Department's care. T.W. left the courthouse on the first day of trial and did not return until the fourth day of trial. T.W. testified that she had been too ill to attend. She stated "I love me," and "I had to take care of my health," but failed to seek medical attention for her illness.

Jones and Sieling testified that, throughout the case, T.W. blamed everybody else for the children's removal from her care and did not take any responsibility for her actions. In Jones's opinion, T.W. continually put her own needs before the children's needs and could not provide the stable home the children required. Trotman, Araiza, Obaze, Jones, and Sieling all testified that, in their opinion, the children should not be returned to T.W. Further, the attorney ad litem for the children advocated that T.W.'s parental rights be terminated.

The jury heard evidence that T.W. loved her children. However, as detailed above, the jury also heard evidence of T.W.'s inability to provide for the emotional stability and protection of the children. As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Further, the jury could infer from T.W.'s past conduct endangering the children's welfare that similar conduct would recur if the children were

–22–

returned to her care. *In re J.D.B.*, 435 S.W.3d at 467–68; *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). We conclude on the record of this case that these two factors weigh in favor of termination of parental rights.

The Emotional and Physical Danger to the Children Now and in the Future

The third *Holley* factor considers the current and future emotional and physical danger to the children. As set out above, T.W. left the children alone in a van at Children's Medical Center and did not seem to appreciate either the need to ensure the children were always adequately supervised or the emotional and physical danger to children from being left without adequate supervision. *See Jones v. Tex. Dep't of Family & Protective Servs*, No. 03-07-00727-CV, 2009 WL 1563544, at *9 (Tex. App.—Austin June 4, 2009, no pet.) (mem. op.) (considering mother's downplay of problems facing children in best interest analysis); *see also See In re A.W.*, No. 05-14-00686-CV, 2014 WL 4291481, at *5 (Tex. App.—Dallas Aug. 21, 2014, pet. filed). We conclude on the record of this case that this factor weighs slightly in favor of termination of parental rights.

Programs Available to Assist the Person Seeking Custody in Promoting the Children's Best Interest

The fifth *Holley* factor considers whether programs are available to assist the person seeking custody in promoting the best interest of the children. The Department offered parenting classes, a psychological evaluation, and both individual and domestic violence counseling to assist T.W. in caring for the children and in dealing with domestic violence that had occurred in her marriage and in a prior relationship. T.W. completed a parenting class in Arkansas, but it was unclear that it met the requirements of the class ordered by the trial court. T.W. also obtained a psychological evaluation in Arkansas, but did not complete the counseling recommended following that evaluation or the counseling ordered by the trial court.

–23–

T.W. relies on a "Section 8" voucher to assist her in renting a house in Dallas to share with the children, but the record is devoid of information concerning the length of time T.W. will receive assistance from that program. Further, the only lease that Trotman had seen for the house expired in January 2014. T.W. receives benefits for the five youngest children based on M.W.'s status as a disabled veteran, but it is unclear the children will continue to receive those benefits following the termination of M.W.'s parental rights. T.W. also believed she would receive "death benefits" for J.L.

If the Department retained conservatorship of the children, it was committed to continuing to provide counseling and psychiatric care to address D.W.'s, J.L.'s, and V.T.'s behavioral issues. T.W. did not testify about any programs available to her to help the children with their behavioral issues. We conclude on the record of this case that this factor weighs in favor of termination of parental rights.

Plans for the Children and Stability of the Home or Proposed Placement

We consider the sixth *Holley* factor, the plans for the children, and seventh *Holley* factor, the stability of the home or proposed placement, together. After the children were removed from her care, T.W. moved back and forth between Texas and Arkansas. In Arkansas, T.W. lived with her father, her sisters and brothers, in a hotel, and in her house. However, the house had been vandalized and was no longer habitable. T.W. was also incarcerated for several months in Arkansas and, at the time of trial, was on probation for five felony offenses.

If the children were returned to her care, T.W. planned to live with them in a four bedroom house in Dallas that she was renting with the assistance of a "Section 8" voucher she received when she was discharged from the shelter. As noted above, the record does not reflect how long T.W. will be able to remain in that house or, given the terms of her probation in Arkansas, whether she will be allowed to live in the house while she is on probation.

Approximately one month before trial, T.W. obtained a part time job in Dallas working the evening shift at Brentwood Health Care. However, her employer did not know that she was on probation for theft, aggravated assault, and possession of a defaced firearm. In addition to the income she was earning, T.W received benefits for some of the children based on M.W.'s status as a disabled veteran. T.W. did not know if the termination of M.W.'s parental rights would affect her ability to collect those benefits. T.W. testified that she would also receive "death benefits" for J.L., but did not know the amount of those benefits.

T.W. planned for the older children to attend a school near the house she had rented. T.W. had contacted a daycare provider about caring for the three youngest children while she was at work and had discussed possible child care with her neighbor. However, T.W. did not appear to have sufficient resources to pay for child care for the three youngest children and had not determined what it would cost to care for the older children while she worked evenings. T.W. did not appear to recognize both the emotional and physical danger to the children from being left without adequate supervision.

Obaze testified that D.W. was "parentified" from helping T.W. care for the younger children and should not live with all her siblings. Further, V.T. was very aggressive toward J.L. and threatened J.L. with physical harm. Due to V.T.'s behavior, it was not clear the two brothers could remain in the same home. T.W. did not testify about any plans or programs that would allow all her children to safely live together.

Throughout this case, the Department arranged for the children to visit each other even when T.W. was not visiting them. Although the Department had attempted to find an appropriate placement for all the children, there was no evidence they could be placed together. Trotman testified the Department would encourage the individuals with whom the children were placed to allow the children to continue to see each other.

If the Department retained custody of the children, it planned to place D.W. with her paternal grandmother, who wanted to adopt her. Obaze believed D.W.'s grandmother could provide D.W. with the stable environment she needed. Both A.W.'s and B.W.'s foster parents were willing to adopt them. The Department planned for J.L. to be adopted but, after an approved home study, would consider placing him with his paternal grandparents. Although V.T.'s foster family had not committed to adopt him, they had committed to allow him to remain in their home. Araiza believed this home provided a stable, well-structured environment. R.W., Ke.W., and Ka.W. had been placed with their paternal great-aunt, and the Department planned for that placement to continue.[5] We conclude on the record of this case that these factors weigh in favor of termination of parental rights.

Parental Acts and Omissions

We consider the eighth and ninth *Holley* factors together. These factors consider acts or omissions of the parent that indicate the parent-child relationship is improper, as well as any excuses for the behavior. As set out in detail above, T.W.'s acts and omissions included exposing the children to domestic violence, leaving the children alone in the van at Children's Medical Center, failing to complete the court-ordered services, failing to attend all scheduled visits with the children, failing to follow the rules and maintain order during visitation with the children, disrupting D.W.'s placements while she was in the Department's care, and being arrested and incarcerated while the children were in the care of the Department.

T.W. admitted she had been in an abusive relationship with M.W. and, at the time of trial, was stilled married to M.W. *See In re V.V.*, 349 S.W.3d 548, 556 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Texas courts routinely consider evidence of parent-on-parent physical

---

[5] We note that the Department's inability to identify definite permanent placements for all the children is not dispositive in determining the best interest of the children. *See In re C.H.*, 89 S.W.3d at 28 (lack of evidence regarding definite plans for permanent placement and adoption cannot be dispositive factor in determining best interest of child).

abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction."); *In re A.M.*, 385 S.W.3d 74, 82–83 (Tex. App.—Waco 2012, pet. denied) (evidence of mother's history of neglecting and endangering children by exposing them to domestic violence supports finding termination was in each child's best interest). She testified they were living separately because M.W. had "PTSD," but they were attempting to reconcile. She did not explain her reasons for staying married to M.W. even though he had abused her.

T.W. also admitted she left the children alone in a van at Children's Medical Center. *See In re T.M.J.*, 315 S.W.3d 271, 278 (Tex. App.—Beaumont 2010, no pet.) (considering fact children were outside unsupervised in conducting best interest analysis). T.W. stated she had no choice but to take the children with her when she sought medical care at Parkland. She told Yarbrough that her friend "Marie" had said she was on her way to watch the children. She then told Martin her friend "Shanasty" had agreed to come watch the children. Neither Marie nor Shanasty was present at Children's Medical Center. At trial, T.W. first testified her friend "Shauinty" was supposed to come watch the children. She then testified she left the children in the van to find a security guard to help them. According to T.W., she was gone for only five or six minutes before returning to the van with a security guard. Although she conceded she made a mistake by leaving the children in the van, she also stated she had no other choice and had done nothing wrong. T.W. did not testify that she understood the problems with leaving the children unsupervised or that she would ensure the children were always adequately supervised in the future. *See In re J.D.B.*, 435 S.W.3d at 467–68 (fact finder may infer from past conduct endangering child's well-being that similar conduct will recur if child is returned to parent's care).

We next turn to T.W.'s failure to complete all the services ordered by the trial court. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (parent's failure to

comply with service plan may affect fact finder's consideration of child's best interest). According to T.W., she was not offered any services after the children were removed from her care. She also did not recall an order from the trial court requiring her to do certain things and claimed that for six months the Department did not tell her what she needed to do to have the children returned to her. T.W. eventually completed a parenting class and underwent a psychological evaluation in Arkansas. She testified she had also been to three counseling sessions. T.W. offered no excuse for failing to complete individual and domestic abuse counseling as ordered by the trial court. T.W. admitted she had not cooperated with the Department, but stated she had not been at her best behavior during the time the children were in the Department's care.

As to visitation with the children, Trotman testified that T.W. missed a number of scheduled visits and it upset the children. T.W. admitted she had not attended visitation regularly because she was incarcerated and was attempting to comply with the terms of her probation. *See In re. C.E.*, No. 02-14-00054-CV, 2014 WL 3866159, at *4 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (per curiam) (mem. op.) (considering fact that mother's probation was subject to revocation in best interest analysis); *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 715 (Tex. App.—El Paso 2012, no pet.) (considering parent's incarceration in best interest of child analysis).

As for following the rules during visitation, T.W. admitted that she gave a cellphone to D.W. She explained D.W. wanted the phone and she allowed her children to have material things. T.W. claimed no one explained to her that D.W. could not have a cellphone. T.W. admitted that she called 911 during one visit with the children, but claimed she did so because the infant had a milk allergy and she was afraid something was wrong with the baby. T.W. did not otherwise address the chaotic atmosphere during her visits with the children. *See In re*

–28–

*C.N.S.*, 2014 WL 3887722, at *10 (considering parent's failure to demonstrate he had learned skills taught during parenting class in best interest of child review).

T.W. admitted that, after D.W. was placed with her grandmother, she filed complaints with "Consumer Affairs" in Arkansas, but denied she did anything to cause D.W.'s placement with her grandmother to end. T.W. did not testify about her conduct that required D.W. to be removed from her first foster home.

T.W. testified she was placed on probation in Arkansas in 2008 for aggravated assault, forgery, possession of a defaced firearm, and two felony theft offenses. *See In re R.R.*, 294 S.W.3d 213, 235–36 (Tex. App.—Fort Worth 2009, no pet.) (evidence of parent's past convictions supported best interest finding). In 2013, T.W. was arrested in Arkansas and incarcerated for several months. *See In re J.B.W.*, 99 S.W.3d 218, 229 (Tex. App.—Fort Worth 2003, pet. denied) (parent's incarceration is one factor courts can consider when determining best interest of child). According to T.W., she had been attempting to meet her "obligations" to the Arkansas court and she would be released from probation after she completed paying $2,200 in restitution.

Given the extent of T.W.'s acts or omissions and her failure to recognize her conduct was detrimental to the children, we conclude these two factors weigh in favor of termination of parental rights.

Statutory Factors

Finally, the jury was instructed it could also consider the statutory factors in determining the best interest of the children. As set out above, the removal of the children from T.W.'s care was based on her leaving the children in a van on one occasion. However, all of the children were younger than nine years old, and the youngest child was only five days old. An individual noticed the children in the van and called security, leading to the children suffering no physical

harm from being left alone. T.W. did not believe she did anything wrong by leaving the children in the van and never stated she would ensure the children were always adequately supervised in the future.

Although T.W. had located a house and a part-time job, she failed to attend counseling as ordered by the trial court and as recommended following her psychological evaluation. Other than her unsuccessful attempt during one visit to control her interactions with the children, she failed to apply anything learned in her parenting classes during her visits with the children. She remained in an abusive relationship with M.W. She was belligerent and aggressive throughout the time the children were in the Department's care and blamed everybody else for her situation. Her interactions with the children during visits demonstrated she was unable to control their environment or provide positive direction for them. We conclude on the record of this case that the statutory factors, particularly factors (1), (6), (7), (10), (11), (12), and (13), also weigh in favor of termination of parental rights. *See* TEX. FAM. CODE ANN. § 263.307(b).

### *Conclusion*

We recognize that termination should not be used as a way to reallocate a child to "better" or more prosperous parents. *In re C.E.K.*, 214 S.W.3d 492, 504 (Tex. App.—Dallas 2006, no pet.). "[P]arental rights may not be terminated merely because a child might be better off living elsewhere." *In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.). In this case, however, the record establishes that T.W. has continued to make choices that do not put her children's safety and welfare first. *See In re A.W.*, 2014 WL 4291481, at *8 (concluding evidence mother did not make safety, security, and stability of children her first priority supported finding termination was in best interest of children); *Jones*, 2009 WL 1563544, at *9 (evidence legally and factually sufficient to support finding that termination was in best interest of children because mother had not shown ability to be safe and stable parent even though

children expressed love and desire to be reunited with mother).  We conclude the jury could have reasonably determined that T.W. could not reliably provide for the children's emotional and physical needs and posed a potential danger to their emotional and physical well-being.  The jury also could have reasonably found that T.W.'s history of instability overshadowed and cast doubt on her ability to consistently use good parenting skills.  *See Danet v. Bhan*, 435 S.W.3d 793, 797–98 (Tex. 2014) (per curiam) (considering parent's past conduct in considering whether evidence was legally sufficient to support best interest finding).  Considering all the *Holley* and statutory best interest factors, and the record as a whole, we conclude clear and convincing evidence supports the jury's findings that termination of T.W.'s parental rights was in the children's best interest.  Accordingly, we resolve T.W.'s sole issue against her and affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

140871F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF: D.W., J.L., V.T., R.W., Ke.W., Ka.W., B.W., and A.W., Minor Children

No. 05-14-00871-CV

On Appeal from the 304th Judicial District Court, Dallas County, Texas, Trial Court Cause No. 12-1043-W. Opinion delivered by Justice Fillmore, Chief Justice Wright and Justice Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 10th day of October, 2014.