**AFFIRMED; Opinion Filed June 10, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-15-01298-CV
_____

### IN THE INTEREST OF A.G. AND A.G., MINOR CHILDREN

_____

### On Appeal from the 416th Judicial District Court
### Collin County, Texas
### Trial Court Cause No. 416-30094-2014
_____

## MEMORANDUM OPINION

Before Chief Justice Wright, Justice Fillmore, and Justice Stoddart
Opinion by Justice Stoddart

This appeal arises from the termination of Mother's and Father's parental rights to their two minor children, A.G. and A.G. Mother and Father filed separate briefs on appeal. In a single issue, Mother argues the evidence is legally and factually insufficient to support the trial court's finding that termination is in the children's best interest. As to Father, the trial court found by clear and convincing evidence that Father was convicted of a criminal offense and he will be confined or imprisoned and unable to care for the children for not less than two years from the date the petition for termination was filed. Father challenges this conclusion on appeal. We affirm.

PROCEDURAL HISTORY

The Department of Family and Protective Services was contacted in June 2014 about A.G. and A.G., and it filed a petition for protection of the children, a suit affecting the parent-child relationship, on July 1, 2014. The trial court entered a temporary order naming the

Department as the children's temporary managing conservator. The children remained in the Department's custody through the time of trial.

A bench trial was conducted over four days. It began in June 2015, resumed in August, and finished in September 2015. On October 26, 2015, the trial court's order terminated Mother's and Father's parental rights and appointed the Department as managing conservator of the children. A notice of appeal was filed.

Mother's and Father's appellate briefs were due in November 2015. After receiving an extension of time, Father timely filed his brief. Mother failed to file a brief. We notified Mother that her brief was overdue, but no brief was forthcoming. In March 2016, we abated the appeal and ordered the trial court to conduct a hearing to determine why Mother's brief was not filed. The trial court held a hearing and determined Mother's attorney had difficulty establishing contact with Mother. Eventually Mother was located. Upon receiving the trial court's hearing record, we reinstated the appeal and ordered Mother to file her brief by May 2, 2016. After two extensions of time, Mother's brief was filed on May 24, 2016. We now consider the arguments made by the parties on appeal.

FACTUAL BACKGROUND

Mother and Father have a daughter and a son, A.G. and A.G. At the time of trial, the daughter was 15 years' old and the son was 12. They also have two adult children who are not involved in these proceedings.

Michelle Phillips, an investigator with the Department, made contact with Mother on June 30, 2014, at a church in Allen, Texas. Phillips learned A.G. and A.G. were in Mother's sole custody because Father was incarcerated for aggravated assault against Mother. Mother and the children had been homeless for "a couple of months" and Mother was unemployed. Sometimes they lived on the streets. At other times they moved from house to house, often living with drug

addicts. The family left one house because another resident attempted to "pimp out" the daughter. There was evidence the children ate food out of dumpsters, which Mother disputed.

Mother was at the church to obtain money to pay for a hotel room for the night of June 30. She planned to move with the children to New Orleans the following day. Instead of a hotel, Phillips wanted the family to move into a shelter, which she considered a more permanent housing solution. Mother declined to go to a shelter.

Phillips asked Mother to take a drug test. Initially Mother refused, but she consented after the church's pastor agreed to pay for a hotel room only if she took the drug test. After Phillips obtained a cheek swab from Mother, Mother "took off with the kids." Carrying clothes, bags, kittens, and a puppy, Mother took the children and ran into the middle of a busy street during rush hour, which scared the children.

Phillips testified there was no evidence on June 30 that Mother was able to care for the children. The Department transported the children to an advocacy center. The Department did not believe the children were safe in Mother's care: they did not have a stable living environment, Mother used drugs and had untreated mental health problems, and Mother had a criminal history. The Department decided to remove the children.

At trial, the Department sought to terminate Mother's and Father's parental rights. Mother desired to have the children returned to her care, which Father supported.

A.    **Mother's Housing & Employment**

When trial began in June 2015, Mother had been employed at Taco Bell for approximately two months and was working with a church to find an apartment. She generally stayed at a hotel, which was paid for by local churches and her Social Security check. The amount of money she received from churches varied each month and sometimes she lacked sufficient funds to stay at a hotel.

When trial resumed in August 2015, Mother still worked at Taco Bell and she lived in a one-bedroom apartment with financial assistance from a church. Mother could pay for the apartment herself, but would struggle to do so.

**B.      Mother's Mental Health**

Mother admitted she used cocaine "off and on" since 2011, and regularly from June or July through December 2014. She described the time period in 2014 when she was using drugs as the time she was "missing." Mother used money from her Social Security check to purchase drugs.

In August 2014, Mother was admitted to Green Oaks Hospital because she was "tripping." She was re-admitted six weeks later in September 2014 because of her drug use. Mother explained she was "having a fit" in the middle of a street after smoking crack for five days. She was admitted a third time in November 2014. Mother has bipolar disorder but does not take her medication because she believes it interferes with her ability to care for her children.

Between July 1, 2014 and June 22, 2015, Mother was arrested three times. She testified she stole from Walmart and "an officer trick[ed] me into prostitution."

Greta Kerwin, a clinical psychologist, performed a psychological evaluation of Mother. She diagnosed Mother with post-traumatic stress disorder stemming from "several traumas in her life" including physical and sexual abuse as a child, a "major depressive disorder," and cocaine abuse. She noted Mother experienced domestic violence and was homeless. Kerwin concluded Mother's mental health problems impede her ability to parent and, until her mental health issues are adequately addressed, Mother is at continuing risk for drug abuse, unemployment, and homelessness. However, Mother lacks reliable transportation, which interferes with her ability to attend counseling appointments. Kerwin testified she is "concerned for [Mother's] well-being and her future, and just her ability to take care of herself, nevertheless [sic] another living being."

## C. Mother's Compliance with Temporary Order

The trial court's temporary order required Mother to attend parenting education and domestic violence classes, complete a psychological or psycho-social evaluation and a substance abuse evaluation, attend counseling, and participate in random drug and alcohol testing. The trial court also ordered Mother to maintain stable, suitable housing and employment.

In January 2015, Mother began working with LifePath Systems. Through LifePath, she completed psychiatric, psychological, and substance abuse evaluations. The psychiatric evaluation showed she suffers from bipolar disorder. Based on her substance abuse evaluation, LifePath recommended that Mother participate in an intensive outpatient program. However, because of instability with housing and transportation, she began attending weekly peer support group sessions instead of the intensive outpatient program. Kristen Charron, a caseworker at LifePath, testified that Mother attended at least three sessions of a peer support group, and would speak to Charron on the telephone when she could not appear in person.

Caryss Hoegenauer, a caseworker for the Department, believed that returning the children to Mother before she completed substance abuse treatment would put the children in danger.

At the time of trial, Mother had not attended the court-ordered domestic violence counseling or parenting classes.

## D. Mother's Visitation with Children

Mother did not attend scheduled visitations with the children for the first six months that they were in the Department's custody, but began regular visitation in January 2015 after she was released from jail. Once Mother began working at Taco Bell, she brought food when she visited the children.

Hoegenauer described Mother's visits with the children as "highly chaotic." Mother talked to the children about her difficult life on the street and the drug users she knew. These stories upset the children who worried about Mother.

During one visit, the son was wearing socks that his foster mom purchased and Mother asked the son to give the socks to her. The daughter then offered to give items she received from the Department to Mother. When Hoegenauer told Mother that the children were not responsible for caring for her, Mother asked: "if her kids weren't going to take care of her, who was."

Mother treated the son less favorably than the daughter. On a few occasions, she would bring a gift for the daughter but not the son. She repeatedly called her son a "piece of dirt." There was testimony that a "good chunk of the visits tends to pretty consistently revolve around [the son's] faults" and on at least one occasion security was called. After visits with Mother, the son's behavior deteriorated and he acted violently. The children's Court Appointed Special Advocates (CASA) volunteer observed some of the children's visits with Mother. She observed that Mother was "very impatient with [the son] and has said some cruel things, but overall, I think the children still want to see her."

### E.    Care of the Children

The children stopped going to school in March 2014, approximately three months before the Department was contacted, because Mother planned to relocate the family to New Orleans where her extended family and Father's family live. Mother testified that both children were "straight A" students before they stopped attending school. The children returned to school after they were removed from Mother's custody. The daughter continued earning good grades, but the son struggled.

Although the son was diagnosed with bipolar disorder, depression, and ADHD, Mother did not give him prescribed medication. Once the son was removed from Mother's care, he

regularly saw a therapist and began taking medication. He still displayed violent tendencies and got into fights at his foster homes. When trial began, the son was staying in a psychiatric hospital.

Hoegenauer testified the children were aware of domestic violence in the home. Mother and Father confirmed there was violence in the home, including the incident for which Father was convicted. Although the children were not home during the assault leading to Father's conviction, they were present during other arguments between their parents, which included hitting and shoving one another. Hoegenauer considered their home with Mother and Father to be a "violent environment."

Although the daughter's foster parents might adopt her, the same is not true for the son who lived in four foster homes after being removed from Mother's care. In one home, the son alleged he was choked by his foster father, and then he was removed from the placement. Hoegenauer testified that if parental rights were terminated, the Department would pursue a foster or adoptive placement for the son.

## F.    Best interest of the children

Mother testified that termination of her parental rights was not in the children's best interest. She explained that even though she does not have a car and uses public transportation, she does "whatever it takes to get . . . to court proceedings . . . or visitation with my children." Mother repeatedly told the Department that she sought custody of her children so the family could move to New Orleans where the family lived until 2005.

Hoegenauer believed termination was in the children's best interests because "ongoing contact with the parent is not beneficial for the children." She explained the children need a home that is stable, free from violence, criminal activity and drug use, where their ongoing needs

can be met. However, Mother was unable to provide those things and previously placed the children in "very detrimental environments."

The children's CASA volunteer agreed that termination was in the children's best interest because the children, particularly the son, needed specialized care. She believed it would be detrimental for the children to be returned to Mother.

STANDARD OF REVIEW

A trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that the parent committed one of the acts prohibited under section 161.001(b)(1) of the Texas Family Code and the termination is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1). Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

When the legal sufficiency of the evidence is challenged in a case involving the clear and convincing burden of proof, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could form a firm belief or conviction that its finding is true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Giving deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, we assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id*. We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. *Id*. If, after conducting the legal sufficiency review, we determine no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *Id*.

In a factual sufficiency review, we look at "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*.

ANALYSIS

**A.     Mother**

Mother challenges the sufficiency of the evidence to support the trial court's finding that termination is in the children's best interest under family code section 161.001(2). *See* TEX. FAMILY CODE ANN. § 161.001(2) (West Supp. 2015).

A judicial determination of the best interest of a child is "not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm.   Rather, 'best interest' is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion."   *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied) (citing *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (orig. proceeding) (plurality op.)).   When reviewing a finding that termination is in a child's best interest, we consider several nonexclusive factors, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the person seeking custody; (5) the programs available to assist the person seeking custody in promoting the best interest of the child; (6) plans for the child by the person seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.   *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re E.C.R.*, 402

–9–

S.W.3d 239, 249 (Tex. 2013) (when reviewing a best-interest finding, appellate court considers, among other evidence, the *Holley* factors). These factors are not exhaustive. *In re D.W.*, 445 S.W.3d at 925 (citing *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). Some of the listed factors may be inapplicable to a case and other factors not on the list may also be considered when appropriate. *Id.* (citing *In re C.H.*, 89 S.W.3d at 27). The absence of evidence about some of the factors would not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in the best interest of the child, particularly if the evidence was undisputed that the parental relationship endangered the safety of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

There is a strong presumption that a child's best interest is served by maintaining the parent-child relationship. *Id.* (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). However, the prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. *Id.* (citing TEX. FAM. CODE ANN. § 263.307(a) (West 2014)).

Mother asserts that no credible evidence was presented at trial showing the children's desires and the programs available to assist the person seeking custody to promote the best interests of the children. Therefore, she argues, the evidence is insufficient. Mindful that the absence of evidence of some factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in the best interest of the child, particularly if the evidence was undisputed that the parental relationship endangered the child's safety, we address these two factors as well as other *Holley* factors in our analysis of Mother's argument.

### 1.    *Desires of the Children*

The first *Holley* factor looks at the children's desires.  Neither child testified at trial, and there is no evidence in the record about the children's desires regarding placement.  Although there is evidence the children love Mother and may enjoy portions of her visits, evidence that a child loves a parent and enjoys visits is only marginally relevant to a best interest finding.  *Id.* at 926.  Based on the record before us, we conclude this factor is neutral, weighing neither in favor of nor against termination of Mother's parental rights.

### 2.    *Emotional and Physical Needs of the Children and Parenting Abilities*

The second and fourth *Holley* factors are related. The second factor considers the children's current and future physical and emotional needs, while the fourth factor considers the parental abilities of the person seeking custody.  *Id.*  The need for stability and permanence is an important consideration for a child's present and future physical and emotional needs.  *Id.*  As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.  *Id.* at 928.  Further, the trial court acting as the finder of fact can infer from a parent's past conduct endangering the children's welfare that similar conduct would recur if the children were returned to her care.  *See id.*

There is substantial evidence of Mother's inability to provide stability for and protect the children, and evidence of the Department's ability to do so.  Hoegenauer explained the children need a home that is stable, free from violence, criminal activity and drug use, where their ongoing needs can be met.  Mother was unable to provide those things and previously placed the children in "very detrimental environments."

Before the Department removed the children, they lived in an environment where they witnessed domestic violence and, after Father was incarcerated, the family was homeless.  They sometimes lived in hotels, but other times lived in houses with drug addicts and lived in a house

–11–

where a resident attempted to "pimp out" the daughter. There is some evidence the children looked in dumpsters for food. Mother removed the children from school.

Once in the Department's care, the daughter had stable housing with a foster family that expressed interest in adopting her. She returned to school where she earned good grades, and became involved in church and dancing. She attended weekly therapy sessions. The son's living situation was less stable. He lived in four foster homes and spent time in a psychiatric facility during the fifteen months he was in the Department's care. However, he also returned to school, attended therapy sessions, and was regularly receiving medication for ADHD, depression, and bipolar disorder, which Mother refused to give to him.

Mother was using cocaine when the Department removed the children, and did not take prescribed medications to treat post-traumatic stress disorder, bipolar disorder, and major depressive disorder. After the children were removed, Mother continued using cocaine for six months, she was arrested three times, and she was admitted to Green Oaks Hospital multiple times. Mother's unaddressed mental health problems impeded her ability to parent and, until she addressed those problems, she continued to be at risk for ongoing drug abuse, unemployment, and homelessness. Kerwin remained concerned about Mother's ability to care for herself or others.

Even after the children were removed, Mother did not foster stability for her children. She did not attend scheduled visitation for the first six months the children were in the Department's custody because she was on drugs, in jail, and at Green Oaks. Once she began attending, the visits were "highly chaotic," security intervened on one occasion, Mother told the children upsetting stories, she said cruel things to her son, and she believed the children should take care of her.

The evidence shows Mother was unable to care for the children's current and future physical and emotional needs. She subjected the children to uncertainty and instability that endangered their physical and emotional well-being. From this evidence, the trial court could have determined similar conduct would recur if the children were returned to Mother's care. *See id.* However, the Department ensured the children attended school and provided mental health services. It also placed the daughter in a stable living situation and continued seeking the same for the son. Considering all of the evidence in the record, we conclude these two factors weigh in favor of termination of Mother's parental rights.

### 3. *Emotional and Physical Danger to the Children Now and in the Future*

The third *Holley* factor considers the current and future emotional and physical danger to the children. *Id.* As discussed above, Kerwin did not believe Mother could adequately care for herself or others and also did not believe Mother could maintain housing or a job until she received adequate mental health treatment. However, by August 2015, Mother was employed and lived in an apartment.

The children's situation before June 2014 put them in danger of emotional and physical harm—they witnessed domestic violence in their home before Father's incarceration, were homeless, and lived with drug abusers. One person where they lived tried to "pimp out" the daughter. On the day the Department became involved, Mother took the children and ran into the middle of a busy street during rush hour, which scared the children. The trial court could infer that similar conduct would recur if the children were returned to Mother's care. *See id.*

The daughter's foster home situation was stable at the time of trial, and she was thriving at home and at school. The son's living situation was not stable, but he attended therapy regularly and took his prescribed medications.

We conclude the third *Holley* factor weighs in favor of termination of Mother's rights.

*4.     Programs Available to Assist the Person Seeking Custody to Promote the Children's Best Interest*

The fifth Holley factor considers whether programs are available to assist the person seeking custody in promoting the best interest of the children.  *Id.*  Mother completed several evaluations with LifePath, but did not attend court-ordered parenting and domestic violence classes.  Mother did not start the intensive outpatient program due to inadequate transportation.

If the Department retained conservatorship of the children, it would continue providing housing and therapy to the children, as it did while it was the temporary managing conservator.  The Department also ensured that the son received medication for his bipolar disorder, ADHD, and depression.

We conclude this factor weighs in favor of termination of Mother's parental rights.

*5.     Plans for the Children and Stability of the Home or Proposed Placement*

We consider the sixth *Holley* factor, the plans for the children, and seventh *Holley* factor, the stability of the home or proposed placement, together.  *Id.* at 929.  Approximately one year after the children were removed from her care, Mother obtained a job and an apartment.  However, Kerwin did not believe Mother could adequately care for herself or others or maintain housing or a job until she received adequate mental health treatment.  If the children were returned to her care, Mother planned to move to New Orleans where her extended family and Father's extended family live.

If the Department retained custody of the children, the Department thought the daughter's foster family could adopt her.  However, the Department did not know what would happen to the son whose foster placements were unstable.  The Department would continue pursuing foster or adoptive placement for the son.

We conclude these factors weigh in favor of termination of the Mother's parental rights to the daughter and are neutral as to the son.

### 6. Parental Acts and Omissions

We consider the eighth and ninth *Holley* factors together. These factors consider acts or omissions of the parent that indicate the parent-child relationship is improper, as well as any excuses for the behavior. *Id.* at 930. As detailed above, Mother's acts and omissions included drug use, homelessness, living with drug dealers and pimps, providing insufficient food for her children, removing the children from school, living in a house with domestic violence, refusing to provide medication prescribed for the son, failing to attend all scheduled visits with the children, telling her children stories about living with drug dealers and on the streets, asking her children to give her items provided by the Department and their foster families, being arrested multiple times while her children were in the care of the Department, and failing to complete all court-ordered programs. Given the extent of Mother's acts and omissions, we conclude these two factors weigh in favor of termination of her rights.

### 7. Conclusion

Most of the *Holley* factors weigh in favor of terminating Mother's parental rights. There is ample undisputed evidence that Mother's actions endangered the safety of the children. *See In re C.H.*, 89 S.W.3d at 27. The evidence showed Mother did not receive adequate mental health treatment, without which she could not adequately care for herself or her children.

On this record, viewing the evidence in the light most favorable to the trial court's judgment, we conclude the trial court could reasonably form a firm belief or conviction that termination of Mother's parental rights is in the children's best interest. Furthermore, viewing the evidence in a neutral light, we conclude the court could reasonably form a firm belief or conviction that termination is in the children's best interest. Having concluded the record

–15–

supports the fact finder's determinations that termination of Mother's parental rights was in the children's best interest, we overrule Mother's sole issue.

**B.      Father**

In his third issue, Father challenges the legal sufficiency of the evidence supporting the trial court's finding under section 161.001(b)(1)(Q).  To support a finding under subsection (Q), the record must show that the parent knowingly engaged in criminal conduct that has resulted in the parent's (1) conviction of an offense and (2) confinement or imprisonment and inability to care for the child for not less than two years from the date the termination petition was filed.  *See* TEX. FAMILY CODE ANN. § 161.001(b)(1)(Q).  In this appeal, Father does not challenge that the termination is in the best interest of the children.

The petition for termination was filed on February 3, 2015.  At that time, Father was incarcerated for aggravated assault against Mother.  He was sentenced to twenty-five years' confinement, and the evidence shows he would be imprisoned for more than two years from the date the petition for termination was filed.  *See id.*  Father was unable to care for the children.

Father argues the trial court erred by terminating his parental rights because his conviction was on appeal when the court entered its termination order.[1]  However, a final conviction is not required.  Several courts, including this one, have concluded convictions constituting grounds for termination under section 161.001 need not be final.  *See In re L.B.*, No. 05-13-01615-CV, 2014 WL 1102050, at *7-8 (Tex. App.—Dallas Mar. 20, 2014, no pet.) (mem. op.) (citing *Rian v. State*, No. 03–08–00155–CV, 2009 WL 2341868 (Tex. App.—Austin July

---

[1] On May 13, 2015, the El Paso Court of Appeals affirmed Father's conviction.  *See Green v. State*, No. 08-13-00308-CR, 2015 WL 2265084 (Tex. App.—El Paso May 13, 2015, pet. ref'd) (not designated for publication).  The El Paso court's opinion in *Green* states Father did not make any arguments on appeal relating to the guilt-innocence phase of his criminal trial, and that the jury sentenced Father to 25 years' confinement.  The trial court entered the final order terminating Father's and Mother's parental rights on October 26, 2015.  The court of criminal appeals refused Father's petition for review on November 4, 2015.

31, 2009, pet. denied) (mem. op.)); *In re W.B.W.*, 11–11–00269–CV, 2012 WL 2856067, *14 (Tex. App.—Eastland July 12, 2012, pet. denied) (mem. op.); *In re T.C.C.H.*, No. 07–11–00179–CV, 2011 WL 6757409, *9 (Tex. App.—Amarillo Dec. 22, 2011, no pet.)(mem. op.); *see also In re D.N., Jr.*, No. 07-15-00041-CV, 2015 WL 2255954, at *5 (Tex. App.—Amarillo May 13, 2015, no pet.) (mem. op.) ("finality of a conviction is not required to support termination under paragraph (Q)."). There was clear and convincing evidence from which the trial court could have reasonably formed a firm belief that Father knowingly engaged in criminal conduct and he was convicted and imprisoned for that conduct.

Once it was established by clear and convincing evidence that Father knowingly engaged in criminal conduct resulting in his conviction and confinement for at least the two-year period after the filing of the petition, the burden shifted to Father to produce some evidence showing he made arrangements for the care of the children during his imprisonment. *See In re H.B.C.*, No. 06-15-00092-CV, 2016 WL 71942, at *4 (Tex. App.—Texarkana Jan. 6, 2016, no pet.) (citing *In re Caballero*, 53 S.W.3d 391, 396 (Tex. App.—Amarillo 2001, pet. denied)). Although Father testified that his mother and other family members could care for the children, his family did not offer supporting testimony. Father's testimony alone does not render the evidence insufficient to a finding of inability to care for the children. *See In re H.R.M.*, 209 S.W.3d 105, 110 (Tex. 2006) (citing *In re Caballero*, 53 S.W.3d at 396) (stating the incarcerated parent's testimony that family members could care for the child did not render the evidence insufficient to support a finding of inability to care).

It is undisputed Father was incarcerated before the petition for termination was filed and was sentenced to 25 years' confinement. There was no evidence Father made any arrangements to care for the children during his confinement. Father left the children with Mother, but Mother's rights were terminated in this proceeding. "Absent evidence that the non-incarcerated

parent agreed to care for the child on behalf of the incarcerated parent, merely leaving a child with a non-incarcerated parent does not constitute the ability to provide care." *Id.* Father did not meet his burden to produce evidence showing he made arrangements for the children's care during his imprisonment.

We conclude the evidence is legally sufficient to support the trial court's finding under subsection (Q). We overrule Father's third issue. In light of our disposition of Father's third issue, we need not address his first and second issues, which relate to the sufficiency of the evidence with respect to the trial court's other findings. *See* TEX. R. APP. R. 47.1.

CONCLUSION

We affirm the trial court's judgment.

/Craig Stoddart/
CRAIG STODDART
JUSTICE

151298F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF A.G. AND A.G., CHILDREN

No. 05-15-01298-CV

On Appeal from the 416th Judicial District Court, Collin County, Texas
Trial Court Cause No. 416-30094-2014.
Opinion delivered by Justice Stoddart. Chief Justice Wright and Justice Fillmore participating.

In accordance with this Court's opinion of this date, we **AFFIRM** the trial court's judgment.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 10th day of June, 2016.