**Affirmed and Opinion Filed August 2, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-19-00256-CV

## IN THE INTEREST OF M.F. AND L.B., CHILDREN

**On Appeal from the 354th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 85,906**

# MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Nowell

This is an appeal from an order terminating the parental rights of Mother to her children, M.F. and L.B. Mother argues the evidence at trial was legally and factually insufficient to support a finding that termination of her parental rights was in the best interest of the children. We affirm the trial court's judgment.

Mother is the mother of both children. Father is Mother's ex-husband and the biological father of M.F. The trial court terminated the parental rights of L.B.'s biological father, but he does not appeal that order. M.F. was eleven years old and L.B. was six years old at the time of trial.

The Texas Department of Family and Protective Services (Department) filed the petition for protection of a child on March 26, 2018. Based on the affidavit filed in support of the petition, the Department alleged there was a continuing danger to the physical health or safety of the

children if returned to the parents. The affidavit indicates the children were living with their maternal great grandmother because it was not safe at Mother's house. M.F. reported that people use drugs and steal things at Mother's house. M.F. claimed that Mother threw him across the room while she was on drugs. M.F. later denied ever saying anyone abused him. However, he stated in his forensic interview that he does not live with Mother because she is addicted to drugs, and he feels unsafe with his mother. After further investigation and contact with Mother, the Department removed the children on March 22, 2018.

One of the documents admitted at trial is the family service plan. It indicates the Department and the maternal grandparents were concerned that Mother will continue using illegal drugs and alcohol and will be unable to look after the children properly, the children could have access to the illegal drugs and alcohol in the home, and Mother will "yell at or physically harm (or chase the children with a bat) the children or other family members resulting in the children becoming hurt or killed." The plan states the Department is concerned that Mother has unaddressed mental health issues and times of instability which could lead to the children's needs going unmet or to their injury or death. The plan also states that Mother told investigators she did nothing wrong and did not agree to work on services.

The service plan for reunification of Mother and the children required her to refrain from using drugs and alcohol, submit to random drug testing, submit to and follow the recommendations of a drug assessment, attend NA/AA meetings at least three hours a week, complete outpatient drug treatment classes, and prepare a written relapse plan upon completion of all drug and alcohol services. Mother was also required to complete and follow the recommendations of psychological and psychosocial assessments. She was required to complete individual counseling sessions to address the specific issues that led to the removal of the children. Other services required of Mother were parenting classes, domestic violence counseling, and anger management classes. Mother was

required to maintain steady employment and safe, stable, and appropriate housing. The plan required Mother to provide proof of successful completion of these services to the Department. It also required Mother to attend all scheduled visits with the children, but provided that visits would be suspended in the event of a positive drug test until the parent provided a negative hair follicle drug test more than thirty days after the failed test.

The trial court's temporary orders added the requirement for Mother to complete a ninety-day inpatient drug treatment program and a Batterer's Intervention and Prevention Program and submit proof of completion of the programs to the Department. The temporary orders also prohibited Mother from communicating directly, in person, by phone, email, text, or social media with Father and his wife.

The case proceeded to a bench trial on February 7, 2019. Cori Holden, a former caseworker for the Department, testified Mother failed to complete the services made available to her. Holden testified Mother told her she did not attend NA/AA meetings, did not complete a psychological evaluation, parenting classes, or anger management. Mother later said she had not completed any services. Mother never provided proof of successful completion of services as required by the service plan. Holden testified that Mother did not attend some court-ordered drug tests.

Although Mother attempted to complete the inpatient drug treatment at Nexus and other facilities, she left after a few days due to extreme anxiety. Holden testified that treatment centers like Nexus are equipped to address issues like anxiety. Holden did not consider Mother's reason for leaving the facility a legitimate reason.

Charlene Green, the current caseworker, testified that Mother told Green shortly before trial that she had completed all her services, but had not turned in any documents. Green told her to provide the documents to the Department as soon as possible before trial and to make certain her attorney knew about the documents and had copies. Green confirmed the Department never

received any proof that Mother completed the services.

Lisa Cuba, a CASA volunteer, observed three visits between Mother and the children. The third visit was terminated early by the Department caseworker. Cuba observed that visit and stated: "I did not observe any mature parenting during that visit. Specifically, she was inciting sullen, angry behavior from [M.F.] towards his dad. And, at the same time, ignoring [L.B.] who was getting more and more upset as the visit progressed." Mother "raised her voice and yelled towards the screen, at the investigative caseworker, after she had received one warning that the visit may have to be terminated." The visit was terminated after Mother violated the warning.

Holden testified that visitation was stopped based on the court's policy of suspending visitation due to drug tests. Visits can be reinstated based on further drug testing. The Department sent Mother for additional drug tests, but her visitation was not reinstated. Green testified that Mother and her preacher dropped off photo albums for the children, but that was the only gift or card Mother provided for the children during her time on the case. Holden testified Mother sent some emails asking how the children were doing, but did not provide gifts or cards for children.

When asked if she had concerns about Mother's ability to meet the physical and emotional needs of the children, Holden testified:

> A. [Mother] was given a reason to believe in a previous CPS case for causing bodily injury to [M.F.], injuring vital areas of his body. She was subsequently arrested and charged with child endangerment for that. And that was in 2011.
>
> [M.F.] told me that there were times that he felt terrified -- and that is a quote -- of his mother. Like, he told me that one time she chased him around with a bat and he was very fearful. [M.F.] expressed to me on several occasions that he never wanted to live with his mother again. He also expressed to me that he was terrified of his mother finding him and [L.B.] and taking them away.
>
> Clearly, things have happened in that home with [Mother] that scared [M.F.] for him to say that he is terrified of his mother. [Mother], throughout the case when I had it, demonstrated no ability to positively parent the children. And she made no effort to utilize any of the programs provided to her to help her in that area.
>
> Holden was also concerned that Mother contacted Father during the case in violation of the

–4–

court's order. She was concerned that if Mother violated a simple and direct order, she would not follow more complex court orders. In addition, Mother "adamantly" objected to the children being placed with Father and told Holden she would rather they be in foster care than be placed with Father. Holden was concerned about Mother's ability "to make appropriate and rational decisions" regarding the children.

Green testified she did not believe Mother could provide for the children's physical or emotional needs based on her "review of the case and the inability of the mother to follow through with anything or fight for her children." Green would also worry the children would be in physical or emotional danger if returned to Mother based on the case history and statements the children made during the case. Based on her experience working this case, observations of the children, and Mother's failure to work the service plan and inability to provide a safe environment, Green testified that it is in the children's best interest for Mother's parental rights to be terminated. Cuba testified that CASA agreed with the Department that termination of Mother's parental rights was in the best interests of the children. Based on her observations during the case, Cuba did not believe Mother could provide for the children's physical or emotional needs and that the children would be in physical or emotional danger if returned to Mother based on Mother's inability to maintain rational behavior or parenting.

Both M.F. and L.B. were placed with Father and his wife at the time of trial. Holden testified she observed the children:

> to be happy and healthy and well taken care of in [Father's] home. [M.F.] directly told me that he feels safe and protected and provided for. [L.B.], when I could get her to sit still and directly tell me anything, she did tell me that she also felt safe. And that both children, 100 percent of the time that I asked them, they wanted to stay where they were.

Holden described her initial observations of the children as follows:

> When I first met L.B., she was nervous, soft spoken. She was hoarding food in her foster home. When I first met M.F., I don't think anybody would ever say that M.F.

–5–

is soft spoken or nervous. I often made the joke that I'm not sure he ever stopped talking once I met him. He was very animated and he came across as highly intelligent and very articulate and very much knew what he wanted.

After being placed with Father, Holden observed that L.B. was "comfortable and calm. She is not hording food. She is animated and happy. Just an overall very excited and sweet girl." Holden explained that L.B. had a speech impediment when she came into care, but made vast improvements while in Father's care. Holden also recognized that M.F. seemed to parent L.B., which was not a typical sibling dynamic. Father testified that M.F. was anxious and always slightly nervous when he was first placed with Father, but now he is outspoken and headstrong, not anxious or nervous at all.

Green also observed the children in Father's home. She testified they were "very calm, very confident. There's no signs of fear, timidness, or shyness when working with the parents. And I have no observation of them being scared or afraid in any way, shape, or form in the home." Green testified that based on her conversations with both children, she believes their desire is to remain in the home with Father and his wife, and for Mother's rights to be terminated.

Father testified that he and his wife planned to adopt L.B. and his wife hoped to adopt M.F. He stated that M.F. is very bonded with his sister and Father wants them to be able to remain together. Green and Holden agreed that Father's home was a stable environment and the children are bonded with each other. Cuba testified the children are happy and bonded in their current placement and L.B. seems "extremely" bonded to Father and his wife. The Department's goal is for the children to remain together in Father's home and for Father and his wife to adopt L.B.

After hearing the evidence, the trial court found that termination was in the best interest of the children and terminated Mother's parental rights under subsections (N) and (O) of section 161.001(b)(1) of the Family Code. TEX. FAM. CODE ANN. § 161.001(b)(1)(N) and (O). Mother challenges only the sufficiency of the evidence to support the finding that termination of her

parental rights is in the best interest of the children.

## STANDARD OF REVIEW

Because of the importance of the parent-child relationship, termination of parental rights requires a higher standard of proof—clear and convincing evidence—than preponderance of the evidence. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). A court may terminate a parent-child relationship if it finds by clear and convincing evidence (1) one or more statutory grounds for termination and (2) that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(1)–(2). Clear and convincing evidence is proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id.* § 101.007.

In reviewing the legal sufficiency of the evidence, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a "firm belief or conviction that its finding was true." *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* In other words, we will disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

In reviewing the factual sufficiency of the evidence, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

A strong presumption exists that the best interest of the child will be served by keeping the

child with a natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). In reviewing the sufficiency of the evidence to support a finding that termination is in the child's best interest, a court examines several factors, including (1) the child's desires, (2) the child's age and emotional and physical needs now and in the future, (3) any emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the plans for the child by those individuals and the stability of the home, (6) the plans for the child by the agency seeking custody and the stability of the proposed placement, (7) the acts or omissions of the parent which may indicate the existing parent-child relationship is not a proper one, and (8) any excuse for the acts or omission of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). A best interest finding need not be supported by evidence of every *Holley* factor, particularly if there is undisputed evidence that the parental relationship endangered the child's safety. *In re C.H.*, 89 S.W.3d at 27. Evidence of grounds for termination listed in section 161.001(b)(1) may also be probative of a child's best interest. *Id.* at 28.

**DISCUSSION**

Because Mother challenges only the best interest finding, we review the evidence in light of the relevant *Holley* factors.

### 1.     Desires of the Children

The evidence reflects that M.F. told Holden he was terrified of Mother, she once chased him around with a bat, and he was very fearful of her. M.F. expressed that he did not want to live with his mother again and was afraid she would find L.B. and him and take them away. The evidence also shows that M.F. and L.B. feel safe with Father and are bonded with each other and with Father and his wife. Green testified she believes the children wish to remain with Father and

his wife.

### 2. Emotional and Physical Needs and Dangers

Stability and permanence are important considerations for a child's present and future emotional and physical needs. *In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied). The evidence indicates the needs of the children can be met by placement with Father. Both children had issues when they came into care, but have improved since being placed with Father. L.B.'s speech impediment is "vastly" improved and she no longer hoards food. M.F. indicated to Green he was very happy with focusing on school and not having to worry about protecting L.B. Holden, Green, and Cuba testified that Father's home is a stable environment for the children. Father and his wife plan to adopt L.B. and his wife plans to adopt both children, which would provide them with the permanence they need for their emotional and physical needs. There is no evidence that placing the children with Father would endanger their emotional and physical needs now or in the future.

In contrast, the evidence raises serious doubts about Mother's ability to meet the emotional and physical needs of the children. Over the several months this case was pending, other than photo albums, Mother did not provide gifts or cards to the children. The CASA volunteer did not observe "any mature parenting" during one visit where Mother incited sullen, angry behavior from M.F. towards Father, while she ignored L.B. who was growing more and more upset during the visit. The visit was terminated early when Mother failed to heed the warning from the caseworker. Afterwards, Mother's visitation was halted due to drug tests and never reinstated.

There is also evidence Mother endangered the children through her unresolved drug use, violence, and untreated mental health issues. The children were removed based on concerns about these issues and the service plan provided services to help Mother overcome these problems. Yet, Mother was unable to successfully complete the services. Holden testified there was a prior

Department case involving Mother causing bodily injury to M.F. and that Mother was arrested and charged with child endangerment as a result. Because of Mother's inability to address her issues by successfully completing the services made available to her, it is likely the dangers to the children's emotional and physical needs would continue in the future if they were returned to Mother.

### 3.    Parental Abilities and Plans of Those Seeking Custody and the Agency

As discussed above, the evidence indicates Father's home is a stable environment for the children and he plans to provide permanency for the children through a permanent placement and adoption. The Department plans to place both children together with Father and supports Father's intent to adopt L.B. and his wife's intent to adopt M.F. and L.B.

### 4.    Acts or Omissions of the Parent and Excuses

The evidence establishes that Mother has unresolved drug use, violence and anger issues, and untreated mental health issues. As a result, she has been unable to meet the emotional and physical needs of the children in the past. Her inability to complete the services specifically designed to address those issues indicates she will be unable to meet the children's needs in the future. While Mother attempted to complete inpatient drug treatment at Nexus, she was unable to do so due to extreme anxiety. However, Holden did not believe this was a legitimate reason for leaving the facility because such facilities are equipped to handle anxiety issues. Further, there is no evidence of an excuse for Mother's inability to complete the many other services required to address her drug use, parenting skills, mental health and anger issues.

After considering the evidence and the relevant factors under the appropriate standards of review, we conclude that the evidence presented at trial and summarized above is legally and factually sufficient to reasonably establish a firm belief or conviction that termination of Mother's parental rights is in the children's best interest. *See* TEX. FAM. CODE ANN. § 106.001(2); *Holley*,

–10–

544 S.W.2d at 371–72. We overrule Mother's sole issue.

CONCLUSION

After reviewing all the evidence under the appropriate standard of review, we conclude the evidence is legally and factually sufficient to establish by clear and convincing evidence that termination of Mother's parental rights is in the best interest of the children. We affirm the trial court's judgment.

/Erin A. Nowell/
ERIN A. NOWELL
JUSTICE

190256F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

IN THE INTEREST OF M.F. AND L.B., CHILDREN

No. 05-19-00256-CV

On Appeal from the 354th Judicial District Court, Hunt County, Texas
Trial Court Cause No. 85,906.
Opinion delivered by Justice Nowell.
Justices Myers and Osborne participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 2nd day of August, 2019.