

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00111-CV

———————————————

IN THE INTEREST OF M.T., A CHILD

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. P2021035

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Birdwell

**MEMORANDUM OPINION**

In four issues, M.T.'s mother appeals the trial court's order terminating their parent–child relationship. Mother contends that the evidence was insufficient to prove that she endangered M.T. under either Subsection (D) or (E) of Family Code Section 161.001(b)(1) and to prove that termination was in M.T.'s best interest under Subsection (b)(2); Mother also contends that the trial court erred by denying her motion for a monitored return as an alternative to terminating the parent–child relationship. We affirm.

### I. Applicable Law and Evidentiary Standards of Review[1]

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(1)–(2); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012).

Here, the trial court found under Subsection (b)(1) that Mother had endangered M.T. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E). To "endanger" a child means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *In re G.F.*, No. 02-21-00267-CV, 2022 WL 524138, at *3 (Tex. App.—Fort Worth Feb. 22, 2022, pet. denied) (mem. op.).

---

[1]We dispense with a preliminary discussion of the facts because we discuss them in our analysis of the issues.

Under Subsection 161.001(b)(1)(D), we examine evidence about the child's environment to determine if the environment caused the physical or emotional endangerment. *Id.* A parent's conduct in the home—such as illegal drug use or drug-related criminal activity—can create an environment that endangers a child's physical and emotional well-being. *Id.*

Under Subsection 161.001(b)(1)(E), we ask whether evidence shows that the parent's conduct directly resulted in the child's endangerment. *Id.* The behavior must constitute a voluntary, deliberate, and conscious course of conduct. *Id.* But that conduct need not be directed at the child, and we may infer the specific danger to the child's well-being from the parental misconduct alone. *Id.* "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id.* (quoting *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). And evidence probative of a Subsection (b)(1) ground may also be probative of best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). In reviewing best-interest evidence, we consider nonexclusive factors that the factfinder may apply:

- the child's desires;

- the child's current and future emotional and physical needs;

- the current and future emotional and physical danger to the child;

- the parenting abilities of those seeking custody and programs available to assist them;

- the parties' plans for the child, including the stability of the proposed home or placement;

- the parent's acts or omissions suggesting that the existing parent–child relationship is inappropriate; and

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

To determine whether the evidence supporting termination is legally sufficient, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

In determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship, we must perform "an exacting review of

4

the entire record," *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014), to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the applicable conduct grounds and that terminating the parent–child relationship would be in the child's best interest, Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

For both types of review, we must remember that the factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

## II. Evidence is Sufficient to Support Termination Over Monitored Return

### A. Endangerment Finding

#### 1. Home Environment

A CPS investigator testified that in September 2020 she began investigating allegations that M.T.'s twelve-year-old brother—who had mental-health issues—had been sexually abused by someone close to the family. Mother confirmed to the investigator that he had outcried to her as well, but she did not believe him.

While investigating the sexual-abuse allegations, the investigator visited M.T.'s home. Mother was initially reluctant to let the investigator inside. The investigator saw "deplorable" conditions: "There was a strong odor of feces and urine. It was difficult to see areas on the floor area. It was covered in trash. There was food, there was

5

boxes, there was, I mean, just items everywhere, including cat feces, multiple cats, overflowing cat boxes." Mother blamed the mess on then-six-year-old M.T. and her brother; Mother showed the investigator her room and her oldest daughter's room, both of which were "somewhat organized and appropriate." M.T. and her brother had been "isolated to the kitchen and living area."

The investigator described her concerns thusly:

Well, there were concerns, all of the children had been not supervised, getting out of the home, not being supervised. There were concerns that the two children were sleeping together in a chair in the living area as well, so not only is there a lack of supervision, but cleaning, again, it was so deplorable, the cat feces in the cat boxes, I don't feel, is the children's responsibilities to clean, especially in that state. I mean, it's unsanitary and unsafe. A six-year-old shouldn't be putting her hands or anything around cat feces or urine.

Again, there was no food. When I pulled in, there was also a plumber there, and later that afternoon, when the children were removed, the child explained to me that they had not had water in the home, it was just recently fixed, so that was also a safety concern for those children at that age.

Mother and the oldest daughter had beds of their own. Mother testified at trial that M.T. and M.T.'s brother had broken their beds, and she had not yet been able to get them new beds.

Mother asked the investigator to remove only her son because "this is his fault." The children became upset when Mother faulted them, and the investigator had to assure them that they were not to blame. Mother seemed to exacerbate the

6

children's emotions; the investigator had to call law enforcement because Mother had them screaming.

According to the investigator, the home's cleanliness had been an ongoing problem. Family-based services would provide services to help clean it up, and it would get dirty again. But she also said this wasn't just a "dirty-home case"; she was concerned the younger children were being isolated from Mother and their older sister.

When the children were removed, they smelled so bad, the caseworker had to drive with the windows down.[2] The children wanted to take showers at the CPS facility, but CPS did not have shower facilities. The investigator was concerned that Mother had given up on the two younger children, based on information she had heard from outside sources and the fact that the two younger children were isolated to one filthy area of the home. Mother also showed the investigator bags full of hundreds of untaken medications; Mother indicated that the twelve-year-old was responsible for taking his own medication but had refused.

M.T. "broke down screaming" and told the investigator Mother had told M.T. the children would be killed and beaten in foster care.

The investigator recounted Mother's Department-related history: the older children had been removed in 2008 because of physical neglect by Mother and

---

[2]At trial, Mother testified that her son refused to shower.

7

physical abuse "by the father."[3] There were at least thirteen other cases opened on the family between 2014 and 2020. But those other cases did not result in removal.

## 2. Mother's Boyfriend and Economic Instability

M.T.'s most recent caseworker testified that Mother had done some of her ordered services but she had not been able "[t]o successfully obtain financial stability and employment." From 2012 to 2020, she did not work because she was taking care of M.T.'s brother. In the past, Mother had relied on others to help her pay her bills, but she had "really started working towards applying for jobs" only in the few months before trial.[4] At the time of trial, Mother was not yet employed, but she was "getting help from the community" and had applied for disability, although she had done so a year before trial.[5] Mother got disability payments for M.T.'s brother and child support for her sister. But the caseworker was concerned that Mother relied on her boyfriend to pay bills.[6]

Mother had been dating her boyfriend for nine months. Although she denied that he had been "living with" her, she admitted that he stayed at her home two nights

---

[3]M.T.'s father was deceased by the time of trial.

[4]She had turned in fifteen job applications.

[5]Mother had gastric bypass surgery in the months before trial and claimed not to have been able to work.

[6]Mother had been involved in four car accidents in the two years before trial. She denied being intoxicated when they occurred or being at fault for three of them. According to Mother, her boyfriend was going to put the title to his car in her name. But she did not know if he would let her continue to drive it if they broke up.

a week. While the case was pending, Mother's boyfriend initially tested positive for marijuana. But Mother thought that he could still be around M.T. if she supervised them. At a family conference in January 2022, a little over a month before trial, Mother's boyfriend admitted that he had used marijuana and methamphetamine but said that the last time he had used drugs was in September or October. However, he submitted a hair-follicle sample after the conference, which was positive for methamphetamine, cocaine, and marijuana; the Department also discovered he had a prior criminal case involving drugs. Nevertheless, Mother testified at trial that she did not have any problems with him being around M.T. "because he ha[d] been clean for two [or three] months."

The caseworker was concerned that Mother's boyfriend had not been honest with them about his drug use and concerned about returning M.T. to the home because of his frequent presence. After the boyfriend's positive drug test, the trial court ordered that Mother's visitation with M.T. had to be supervised.[7]

Mother said this was her first relationship that did "not have domestic violence." She trusted her boyfriend around M.T. because "he's a good man." The caseworker was concerned that Mother had not shown a willingness to protect M.T. or even an understanding of why it was important for her not to have a relationship

---

[7]The Department was also concerned that Mother had taken a selfie with M.T. and her boyfriend and posted it on Facebook. The three were in a bed together, and although they were fully clothed, the Department was concerned because it was the first time M.T. had met the boyfriend.

with her boyfriend for her daughter's sake. The Department had warned Mother that continuing the relationship could have an adverse effect on whether M.T. was returned to her. Even so, Mother told the caseworker that she would stay with her boyfriend. But when asked at trial what she could tell the court about her desire to remain in a relationship with him, Mother said she had made the decision "[j]ust now" to end the relationship.[8] She could not explain why she had not made the decision sooner.

### 3. Other Post-removal Conditions

Mother admitted filming sexually oriented videos at her home and posting them to her OnlyFans[9] webpage as recently as January 2022, before trial began in March. She posted a link to her OnlyFans page on her own Facebook page. The Department caseworker was concerned that because Mother's Facebook page used her actual name, the children could see and access the OnlyFans page or someone could try to find out where Mother lived. Mother told the court she would delete the OnlyFans page that day. But she denied ever making sexually explicit videos around her children.

---

[8]Mother testified via Zoom instead of attending trial because she wanted to stay with her boyfriend, who had been hospitalized a couple of weeks before trial.

[9]"OnlyFans is a subscription-based website that allows content creators to share sexually explicit materials with their fans, after engaging in direct messages and other interactions, for a fee." I. India Thusi, *Reality Porn*, 96 N.Y.U. L. Rev. 738, 740 (2021).

The Department was also concerned that M.T.'s teenage sister was overly sexualized with older men and had discussed the behavior with Mother. Eventually, Mother agreed for the Department to take managing conservatorship of M.T.'s sister and brother so that they could continue in their then-current placements.

By the time of trial, Mother had received psychological evaluations, participated in counseling, and made progress in cleaning up the home.[10] She claimed to have worked all of her services except getting employment. She had been visiting with M.T. and said M.T. told her at every visit that she wanted to come home. Additionally, Mother's boyfriend had been working a service plan.

Mother asked the court for a monitored return. *See* Tex. Fam. Code Ann. § 263.403. She said if M.T. were to be returned to her, she would not allow M.T. to have unsupervised contact with her boyfriend and she would refuse him any contact with M.T. if he appeared under the influence; she would comply with any protective measures implemented so that M.T. would not be exposed to any illegal substances; her boyfriend would continue working a service plan; and both she and her boyfriend would submit to drug testing.[11]

---

[10]Mother still had nine cats, but she had vaccinated them and had cleaned the litter boxes; the Department had not asked her to remove the cats. She also had obtained mattresses and box springs, and there was no longer trash in the front or back yard. The Department's services contractor had helped her get a new bathtub.

[11]A Department supervisor testified that if M.T. were to be returned to Mother, the Department would provide a service plan for the boyfriend "to make the home as safe as possible."

M.T. was living in a foster home at the time of trial. M.T.'s ad litem told the trial court that, personally, she did not feel it was in M.T.'s best interest to go home. But because M.T. wanted to go home, the ad litem said she would advocate it even though she did not believe it was in M.T.'s best interest. The CASA[12] told the trial court that M.T. had told him she missed home because she missed playing a game with her siblings in which they would ask her questions and then hit her if she got an answer wrong. The CASA thought this anecdote showed that M.T. did not have a good idea of what was best for her and showed that there was a lack of discipline in Mother's home. The CASA was concerned about Mother's repeated failure to make better parenting decisions despite Department interventions since 2008. He had not seen any evidence that would justify sending M.T. back to that environment.

### 4. Mother Endangered M.T.

We conclude the evidence of the home's condition at the time of removal—a condition that had not improved despite past Department intervention and community attempts to help Mother—as well as Mother's attempt to shift responsibility for the children's needs to them from herself supports the trial court's endangerment findings. Parental neglect can be as dangerous to the children's well-being as direct abuse. *In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *17 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.). Allowing

---

[12]CASA is an acronym for court-appointed special advocate. *In re J.W.*, No. 19-1069, 2022 WL 1739028, at *7 (Tex. May 27, 2022).

children to live in unsanitary conditions and neglecting their physical condition supports a finding that the parent has endangered the children's physical and emotional well-being. *Id.* We therefore overrule Mother's first and second issues.

**B. Termination in M.T.'s Best Interest**

In addition to the evidence of endangerment, although Mother had cleaned the home and maintained it better—and she had engaged in counseling and was seeking employment—the evidence showed she still had not learned her role as a parent in providing a safe and stable environment for M.T. She did not have any definite plans for M.T. She had not worked long for—and did not seem to understand the importance of achieving—financial stability,[13] continued a relationship with her boyfriend despite the Department's concerns about his drug use, and failed to appreciate her role in a proper parent–child relationship. Although M.T. wanted to return to Mother, there was also evidence that M.T. lacked the maturity to know whether that would be a good choice for her. *See In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied) ("[A] child's preference should not be considered absent a showing of sufficient maturity . . . ."). Although there was no evidence about M.T.'s then-current living conditions—other than that she was in foster care—the trial court could have determined that given the choice between foster care and Mother's care, foster care would be the more stable of the two. *See*

---

[13]That a parent is economically disadvantaged does not constitute clear and convincing evidence sufficient to support a finding under Family Code Section 161.001(b). Tex. Fam. Code Ann. § 161.001(c)(2).

Tex. Fam. Code Ann. § 153.001 ("The public policy of this state is to . . . provide a safe, stable, and nonviolent environment for the child . . . ."). Thus, we hold that the evidence supports the trial court's best-interest finding. Because the evidence supports the trial court's decision to terminate the parent–child relationship, we will not disturb its discretion in choosing that option over a monitored return. We therefore overrule Mother's third and fourth issues.

### III. Conclusion

Having overruled all of Mother's issues, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: June 30, 2022