**Affirm and Opinion Filed October 4, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00341-CV**

**IN THE INTEREST OF A.C., A CHILD**

**On Appeal from the County Court At Law No. 1**
**Kaufman County, Texas**
**Trial Court Cause No. 107543-CC**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Pedersen, III, and Nowell
Opinion by Justice Nowell

The trial court terminated Mother's and Father's parental rights to their child, A.C.[1] Following a one-day trial, the trial court found by clear and convincing evidence that statutory grounds exist for the termination of Mother's and Father's parental rights to A.C. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (P). The trial court also found termination of the parent-child relationship to be in A.C.'s best interest. *See id.* § 161.001(b)(2). Mother raises three issues on appeal from the trial court's order, and Father's counsel filed an *Anders* brief.

---

[1] We refer to the appellants as "Mother" and "Father" and A.C. by his initials to protect his identity. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

FACTUAL BACKGROUND

On February 11, 2021, Mother was arrested for possession of a controlled substance when the police stopped a vehicle driven by Father in which she was a passenger. Mother advised the officers that Father could care for five-year-old A.C., and they released A.C. to Father. Although Mother asked that the officers not contact the Department of Family and Protective Services, they did so anyway. Mother subsequently pleaded guilty to possession of a controlled substance.

A safety plan for A.C. was put into place on February 23. The plan called for a neighbor to check on A.C. throughout the day. Subsequently, the neighbor contacted the Department to report that Father attempted to purchase urine from the neighbor for a drug test that Father had to submit to the Department. A.C. was removed from Father's care, placed with family members, and then moved to foster care. Subsequently, the Department was named as A.C.'s temporary managing conservator, Ashley Gaskey was assigned as his case worker, and Doug Pritchard was the appointed CASA and guardian ad litem.

Gaskey met with Mother to discuss her social history and create a service plan. Mother reviewed her service plan and acknowledged she understood what was being asked of her. Her service plan was filed with the trial court, and the trial court took judicial notice of it during trial. Mother's service plan states the Department and CASA were concerned that Mother did not properly supervise A.C. when she was under the influence of methamphetamines and marijuana, which could result in

serious harm or injury to A.C. because he was too young to care for himself. Additionally, Mother continually used illegal substances and possibly exposed A.C. to methamphetamines and marijuana. Her service plan included the following action items:

- Obtain and maintain stable legitimate employment, provide the Department with monthly pay stubs, and notify the Department within 72 hours of any change in employment;

- Obtain and maintain safe, stable, and drug-free housing;

- Refrain from using illegal substances and maintain a drug-free lifestyle;

- Resolve all outstanding legal matters;

- Submit to random drug testing upon the Department's request;

- Initiate a psychological evaluation and individual counseling; and

- Initiate parenting classes.

Mother completed a psychological assessment, after which it was recommended that she obtain a psychiatric evaluation, participate in individual counseling, and complete a parenting course. She did not initiate any of these services. The assessment report also recommended that she avoid illicit drug use, submit to random drug tests as a form of external motivation for abstinence, and obtain stability in employment and residential situations.

Mother understood she had to complete her services before the Department would return A.C. to her care. Gaskey testified that Mother started making

–3–

appointments for her services right away, but she "also started missing right away too." Mother indicated she wanted to obtain a stable job and housing before beginning her services.

Mother began using marijuana when she was fourteen years old and methamphetamines when she was fifteen years old; Mother was twenty-five years old at the time of trial. Mother stopped using methamphetamines while she was pregnant with A.C. and during the first couple years of his childhood. Mother started using drugs again in late-2020 and was using methamphetamine almost daily until she was arrested in February 2021. Mother admitted using methamphetamines while A.C. was in her care. Father began using methamphetamines at or near the time of A.C.'s birth. When asked whether the parents understood that their use of methamphetamines negatively affected their ability to parent, Gaskey testified: "No. They thought if [A.C.] was in a different room when they were smoking, it wasn't impacting him. Even though they were under the influence, they were still able to parent [A.C.] effectively."

Gaskey had no reason to believe that Mother had addressed her methamphetamine addiction. With one exception, throughout the pendency of this case, Mother either tested positive for drugs or failed to appear for drug tests. When a person fails to appear for drug testing, the Department considers the test a presumed positive. Mother had presumed positive results after being ordered to participate in substance abuse treatment. Gaskey testified that drug use was the

–4–

biggest impediment to Mother having a stable home, stable job, and A.C. returned to her. When Pritchard discussed the reasons that A.C. was in the Department's care with Mother, she understood it was due to her substance abuse.

Mother was required to obtain stable housing, but she did not do so. Gaskey testified that before A.C. was removed, Mother and Father lived in a house where the roof "was falling in," "there were no steps to the house," and the house smelled like methamphetamines. Mother confirmed they had smoked methamphetamines in the house. After A.C. was removed, Mother and Father lost this housing and then lived in their car, a motel, and with one of Father's uncles.

Mother also was required to provide proof of income. She reported she inherited two rental properties, but she never provided proof of income from them. Mother worked in a factory for less than a week; Gaskey testified that Mother said she could not continue working at the factory because "she was living in her car and so she was stressed about housing so she couldn't get to work on time, so she quit." At the time of trial, Mother worked at a car dealership washing cars, and Gaskey visited Mother's place of employment. Gaskey was unable to determine how many hours per week Mother worked, and Mother also did not provide pay stubs.

Mother repeatedly raised issues about transportation, including flat tires, her car being towed, and her car breaking down on the way to visitation with A.C. Gaskey offered to transport Mother to drug testing and inpatient drug rehabilitation, but not for visitation because Mother would not prove she was sober. Gaskey

testified that Mother had vehicles throughout the pendency of this case; "she had two vehicles. She got a truck that her mother left her and then she had two or three cars after that." When asked about Mother's transportation issues, Doug Pritchard, A.C.'s guardian ad litem, testified: "Whenever she wanted transportation, she obtained it."

However, Mother's driver's license was suspended due to outstanding tickets. Gaskey talked to Mother on multiple occasions about starting a payment plan for the outstanding tickets so that Mother could have a license again, but Mother did not do so. On one occasion, Mother's car was towed because she had an invalid license and expired registration. Mother knew that her failure to remedy her outstanding parking tickets and invalid driver's license could affect whether A.C. was returned to her.

Father reported Mother physically abused him. Gaskey testified: "[Father] told me that him [sic] and [Mother] would fight all the time. She would throw things at him. He's missing part of his ear, and he told me that was from a situation he was having with [Mother] and he lost part of his ear." He explained that Mother "threw something at him and it tore off part of his ear." Gaskey saw fresh wounds on Father and confirmed part of Father's ear was missing. Father did not make a police report. When Father made the report to Gaskey, he and Mother had separated, but they reunited the following week. Mother denied any domestic violence in the relationship, and Gaskey did not observe any injuries on Mother. Gaskey hoped the parents would address the reported domestic violence in individual counseling.

Mother attended twenty three of forty parent-child visits, and her last visit was on January 31, 2022. Gaskey observed visits between A.C. and Mother. During visits, Mother would tell A.C. that he did not have to listen to Gaskey or the relatives with whom he was living. Gaskey testified: Mother "would slam doors sometimes. She would get a toy and mimic me and other employees to [A.C.] just making fun of our actions and what we were saying, so she would have to be redirected often during visits." When asked whether she thought A.C. was "well bonded" with Mother, Gaskey replied "[n]ot really." But when the case began, A.C. had "issues with separation from his mom." A.C. did not initiate affection with his mother.

Gaskey obtained A.C.'s medical records dating back to when he was born. The records indicated A.C. had been to the doctor at least once per year and had received required shots; no doctor's notes indicated any concerns about A.C.'s wellbeing.

After A.C. was removed, he was placed with a foster family for approximately three months. Mother gave a cell phone to A.C. before he entered foster care so that he could play games. After A.C. was removed, A.C.'s foster parents alerted Pritchard that they observed A.C. watching pornography on the phone; Pritchard saw the contents of the cell phone himself. He testified there were "at least a dozen extremely pornographic videos on the cell phone." When asked whether the videos were "what people could consider hardcore pornography," he responded, "[b]eyond that." When

Pritchard asked Mother whether she knew there was pornography on the phone, she told him she did not know and questioned "what's wrong with pornography."

A.C. was removed from the foster family and placed with an uncle and aunt; he continued living with the uncle and aunt through the time of trial. Gaskey testified the uncle "reported that he knows [A.C.] was left alone on multiple occasions when [Mother and Father] had him." The Department planned for A.C. to be adopted. The aunt and uncle could not adopt A.C. because he has behaviors they are not able to manage; Gaskey believed these were normal childhood behaviors.

The foster family where A.C. was initially placed was interested in adopting A.C. Gaskey testified the family wanted "him to come back in the home and make sure that everything is still good with him and the other children in the home. They are open to adopting if things go well." The Department considered this placement suitable for A.C., and, if the Department remained the conservator after trial, Gaskey expected A.C. would be moved the following week. She believed this placement would be in his best interest. Pritchard testified A.C. received "[o]utstanding care" in the foster home, and Pritchard opposed A.C. leaving that home. He "[a]bsolutely" believed the foster home was equipped to meet all of A.C.'s needs, and it is in his best interest to return there.

Gaskey did not believe it was in A.C.'s best interest to be returned to a parent who is actively using methamphetamines or lacked stable housing or jobs. When asked whether he thought termination was in A.C.'s best interest, Pritchard replied

"[a]bsolutely." He also believed it was in A.C.'s best interest to obtain permanency through adoption.

Mother did not appear at trial because there was an outstanding warrant for her arrest. After being arrested in February 2021, Mother pleaded guilty to possession of a controlled substance and was placed on community supervision. However, because Mother failed to report, her community supervision was revoked and a warrant issued for her arrest. Mother said she did not want to be arrested at trial in this case.

The trial court terminated Mother's parental rights pursuant to subsections 161.001(b)(1)(D), (E), (O), (P) of the family code and found termination was in A.C.'s best interest pursuant to subsection 161.001(b)(2).

## MOTHER'S APPEAL

In three issues, Mother argues the evidence is legally and factually insufficient to support termination under family code subsections 161.001(b)(1)(D) and (E) and insufficient to support a finding that termination is in A.C.'s best interest.

### A.      Standards of Review

Because the fundamental liberty interest of a parent in the care, custody, and control of her child is one of constitutional dimensions, involuntary parental termination must be strictly scrutinized. *In re C.V. L.*, 591 S.W.3d 734, 748 (Tex. App.—Dallas 2019, pet. denied) (citing *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000); *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014); *Holick v. Smith*, 685 S.W.2d

–9–

18, 20 (Tex. 1985)). In parental termination cases, due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE. ANN. § 161.001(b). "Clear and convincing evidence" is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) (quoting TEX. FAM. CODE. ANN. § 101.007)).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re C.V. L.*, 591 S.W.3d at 748. "As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* (quoting *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018)). Under both legal and factual sufficiency standards, we (i) consider all the evidence, (ii) defer to the factfinder's credibility determinations, and (iii) determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* (quoting *In re A.C.*, 560 S.W.3d at 630–31).

When conducting a legal-sufficiency review of an order terminating parental rights, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *Id.* We "consider all the evidence, not just that which favors the verdict,"

and we assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *Id.* We disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id*. 748-49.

When reviewing the factual sufficiency of the evidence supporting a termination finding, an appellate court asks whether, in light of the entire record, the evidence is such that a fact-finder could reasonably form a firm conviction about the truth of the State's allegations against the parent. *Id.* at 749. Further, the appellate court must consider whether the disputed evidence is such that a reasonable fact-finder could not have reconciled that disputed evidence in favor of its finding. *Id*. If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id*. "And in making this determination, the reviewing court must undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *Id.*

### B. Family Code Section 161.001(b)(1)

Texas Family Code Section 161.001(b)(1) allows for involuntary termination of parental rights if a court finds by clear and convincing evidence both that a parent engaged in one or more enumerated predicate grounds for termination and that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(A)-(U), (b)(2); *see also In re M.P.*, 639 S.W.3d 700, 701–02 (Tex. 2022). However, because an order terminating a parent's rights under subsection (D)

or (E) can be used as a basis to terminate the parent's rights to another child under subsection 161.001(b)(1)(M), terminating rights under (D) or (E) has "significant" collateral consequences. *In re C.V. L.*, 591 S.W.3d at 749 (citing *In re N.G.*, 577 S.W.3d at 234; TEX. FAM. CODE ANN. § 161.001(b)(1)(M)). Therefore, "due process requires an appellate court to review and detail its analysis as to termination of parental rights under section 161.001(b)(1)(D) or (E) of the Family Code when challenged on appeal." *Id.* (quoting *In re Z.M.M.*, 577 S.W.3d 541, 543 (Tex. 2019) (per curiam)).[2]

Under section 161.001(b)(1)(D), parental rights may be terminated if clear and convincing evidence supports a finding that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Section 161.001(b)(1)(E) allows for termination of parental rights if clear and convincing evidence supports a finding that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct

---

[2] Mother did not challenge the trial court's findings pursuant to subsections 161.001(b)(1)(O) and (P). The Department argues the unchallenged findings are sufficient to support the trial court's judgment. Generally a party's failure to challenge all findings supports affirmance of the termination order. *See In re S.L.*, No. 05-21-00874-CV, 2022 WL 896874, at *6 (Tex. App.—Dallas Mar. 28, 2022, pet. denied) (per curiam) (mem. op.). However, as noted, when parental rights are terminated under subsection 161.001(b)(1)(D) or (E), due process requires the court of appeals to review and detail its analysis as to termination of parental rights under subsection (D) or (E) when challenged on appeal, even if the termination can be upheld on other grounds. *Id.* (citing *In re Z.M.M.*, 577 S.W.3d at 542–43). Accordingly, we do not affirm the trial court's order on the basis of subsections (O) and (P).

–12–

which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

Subsections (D) and (E) both require proof of endangerment. "Endanger" means to expose to loss or injury or to jeopardize a child's emotional or physical health, but it is not necessary that the conduct be directed at the child or that the child actually suffer an injury. *In re C.V. L.*, 591 S.W.3d at 750. Specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Id.* A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *Id.* The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Id.*

"[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Evidence of a parent's drug use, or evidence that another parent allowed a child to be around a parent or other persons using drugs, can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection (D) and can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being under subsection (E). *In re C.V. L.*, 591 S.W.3d at 751. Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under subsection (E). *Id.* "And where the record contains evidence that a parent engages in drug use during the pendency of a termination suit, when he

knows he is at risk of losing his children," such evidence has been found legally sufficient to support a finding of endangerment under subsection (E). *Id.*

### C. Sufficiency of the Evidence under Subsections § 161.001(b)(1)(D) and (E)

Mother challenges the legal and factual sufficiency of the evidence to support termination pursuant to subsections 161.001(b)(1)(D) and (E). The undisputed evidence shows Mother has an extensive history of drug use, which began when she was a teenager. Although she stopped using drugs for approximately three years when A.C. was born, she resumed using in 2020 when A.C. was five years old. Before he was removed, Mother used drugs while she was caring for A.C., and she did not believe the drug use impacted A.C. or her ability to parent if A.C. was in a different room. Mother also requested that A.C. be cared for by Father even though Father used methamphetamines throughout A.C.'s life. There is no evidence that Mother took steps to address her drug addiction during the pendency of the case. During the pendency of this case, one of Mother's drug tests was negative; the remaining tests were either positive or presumptively positive because she failed to appear.

The evidence shows Mother's long-standing struggle with drugs interfered with her ability to obtain and maintain stable housing, employment, and transportation. When the case began, Mother was living in the ranch house where the roof "was falling in," "there were no steps to the house," and the house smelled like methamphetamines. After that, Mother lived in a motel, in her car, and with one

of Father's family members. Some evidence shows Mother was violent toward Father and she did not attend counseling to address the domestic violence concerns.

Mother provided A.C. with a cell phone that was found to have "at least a dozen extremely pornographic videos" on it, and Mother did not consider a five year old watching these videos as problematic.

Considering the undisputed evidence in the record, we conclude the evidence is legally and factually sufficient to support the trial court's determination that Mother knowingly placed or knowingly allowed A.C. to remain in conditions or surroundings that endangered his physical or emotional well-being and engaged in conduct or knowingly placed A.C. with persons who engaged in conduct which endangered A.C.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). We overrule Mother's first and second issues.

### D.     Sufficiency of the Evidence under Subsection § 161.001(b)(2)

The trial court also determined that termination of the parent–child relationship was in A.C.'s best interest. In her third issue, Mother argues the evidence is legally and factually insufficient to support this finding.

The supreme court has identified a nonexclusive list of nine factors that may assist our review of a best-interest finding:

> (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the person seeking custody; (5) the programs available to assist the person seeking custody in promoting the best interest of the child; (6) plans for the child by the person seeking custody; (7) the stability of the home or

–15–

proposed placement; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Additionally, the family code sets out factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. TEX. FAM. CODE ANN. § 263.307(b); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (citing family code section 263.307 and *Holley* as containing factors to consider "when determining whether termination of parental rights is in the best interest of the child"). The statutory factors include:

> (1) the child's age and physical and mental vulnerabilities; . . . (3) the magnitude, frequency, and circumstances of the harm to the child; . . . (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family; . . . (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child . . .; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM. CODE ANN. § 263.307(b)(1)–(13).

The *Holley* factors and the statutory factors focus on the best interest of the child, not the best interest of the parent, and are not exhaustive. *In re V.E.B. and C.B.*, No. 05-22-00426-CV, 2022 WL 4007880, at *3 (Tex. App.—Dallas Sept. 2, 2022, no pet. h.) (mem. op.) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). A best interest finding need not be supported by evidence of every factor. *See id.* (citing *In re C.H.*, 89 S.W.3d at 27). Although there is a strong presumption that maintaining the parent–child relationship serves the child's best interest, there is also a presumption that promptly and permanently placing the child in a safe environment is in the child's best interest. *Id.* (citing *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied); TEX. FAM. CODE ANN. § 153.131(b)).

At the time of trial, A.C. was six years old. He could not care for himself and was dependent on others to meet his physical and emotional needs. The Department was contacted after Mother was arrested for drug possession; at the time of her arrest, Mother asked that the Department not be contacted and A.C. be released to Father who had used methamphetamines throughout A.C.'s life. Throughout the pendency of this case, Mother tested positive for drugs or failed to appear for tests. Mother told Gaskey that, except for a three-year interlude, she had been using drugs for ten years. She believed that using methamphetamines while caring for A.C. did not adversely impact A.C. or her ability to parent as long as he was in a different room.

–17–

Although Mother was referred to inpatient drug treatment and individual counseling, she did not attend.

Due to her drug use, Mother was unable to maintain stable employment or provide a safe home for A.C. Evidence indicated Mother physically abused Father, and Mother did not address the domestic violence in counseling. Other evidence showed Mother had left A.C. alone even though he was under six years of age.

A.C. was not well bonded to Mother and did not initiate affection with her, but he did struggle with the initial separation from her. Mother attended more than half of the scheduled visitations, but Mother had "to be redirected often" during those visits. Mother provided A.C. with a cell phone that was found to have "at least a dozen extremely pornographic videos" on it, and Mother did not consider a five year old watching these videos as problematic. Mother did not appear for trial because she did not want to be arrested based on an outstanding warrant issued after her probation was revoked for failing to report to her probation officer.

The Department presented evidence that its plan for A.C. was to return him to the foster family where he was originally placed and where he received "[o]utstanding care." The foster family was capable of meeting A.C.'s needs and was open to adopting him if his return to the family went well. The Department considered this placement suitable and in A.C.'s best interest; the Department did not consider returning A.C. to his mother who had an active methamphetamine

addiction and who could not maintain stable employment or housing to be in A.C.'s best interest.

Considering all of the evidence and applying the applicable *Holley* and statutory factors, we conclude the evidence is legally and factually sufficient to support the trial court's determination that Mother was unable to properly care for A.C. and provide a safe environment for him. Accordingly, termination of the parent–child relationship between Mother and A.C. was in A.C.'s best interest. We overrule Mother's third issue.

### FATHER'S APPEAL

Father's appointed counsel submitted a brief in which counsel contends there are no arguable grounds to be advanced on appeal. *See Anders v. California*, 386 U.S. 738 (1967). *Anders* procedures apply in termination of parental rights cases. *See In re A.L.D.-B.*, No. 05-22-00277-CV, 2022 WL 3584629, at *1 (Tex. App.—Dallas Aug. 22, 2022, no pet. h.) (mem. op.); *In re D.D.*, 279 S.W.3d 849, 850 (Tex. App.—Dallas 2009, pet. denied).

An *Anders* brief must "contain a professional evaluation of the record demonstrating why, in effect, there are no arguable grounds to be advanced." *High v. State*, 573 S.W.2d 807, 812 (Tex. Crim. App. [Panel Op.] 1978) (cited by *In Interest of P.M.*, 520 S.W.3d 24, 28 n.14 (Tex. 2016), in reference to what an *Anders* brief is). "This evaluation requires not only that counsel refer the court to anything in the record that might arguably support the appeal, citing applicable legal

authorities, but it also requires appellate counsel to discuss the evidence introduced at trial which entails providing the reviewing court with ready references to the record." *Stafford v. State*, 813 S.W.2d 503, 510 n.3 (Tex. Crim. App. 1991) (en banc); *see also High*, 573 S.W.2d at 813 (describing requirements for *Anders* briefs).

When appellate counsel is appointed to represent an indigent defendant, "his only justification for filing an *Anders* brief is his ethical obligation to avoid burdening the courts with wholly frivolous appeals." *Kelly v. State*, 436 S.W.3d 313, 318 (Tex. Crim. App. 2014). After court-appointed appellate counsel files an *Anders* brief asserting that no arguable grounds for appeal exist, we independently examine the record to determine whether an appeal is "wholly frivolous." *Anders*, 386 U.S. at 744. An appeal is wholly frivolous when it lacks any basis in law or fact; an argument is frivolous if it cannot conceivably persuade the court. *Crowe v. State*, 595 S.W.3d 317, 319 (Tex. App.—Dallas 2020, no pet.). An appeal is not wholly frivolous when it is based on "arguable" grounds. *See Anders*, 386 U.S. at 744.

If, after conducting an independent review of the record, we conclude "either that appellate counsel has not adequately discharged his constitutional duty to review the record for any arguable error, or that the appeal is not wholly frivolous, notwithstanding appellate counsel's efforts," we abate the appeal and return the cause to the trial court for the appointment of new appellate counsel. *Meza v. State*, 206 S.W.3d 684, 689 (Tex. Crim. App. 2006); *see also Crowe*, 595 S.W.3d at 319 (recognizing and applying these rules).

–20–

With these principles in mind, we turn to considering counsel's *Anders* brief in this case. Counsel's brief provides a thorough recitation of the facts in the record and legal standards applicable to cases in which parental rights are terminated. However, more than a discussion of the evidence at trial is required. *See High*, 573 S.W.2d at 813. At the beginning of the trial, Father's counsel requested an extension of time of the automatic dismissal date pursuant to section 263.401 of the family code and explained why Father requested the extension. *See* TEX. FAM. CODE § 263.401. The trial court denied the motion. Counsel's *Anders* brief fails to discuss the motion or the trial court's ruling. Additionally, counsel's *Anders* brief, while recognizing that the Department must show termination is in the best interest of the child by clear and convincing evidence, fails to analyze the issue or explain why an appeal of this issue is frivolous. Counsel's entire analysis of the best-interest standard is: "The only testimony regarding the best interests of the children was in the Petitioner's favor as well." This conclusory statement is insufficient to satisfy the requirements of an *Anders* brief.

We conclude the brief does not satisfy the *Anders* briefing requirements because it does not contain a professional evaluation of the record demonstrating why there are no arguable rounds to be advanced. *See High*, 573 S.W.2d at 812. We express no opinion as to whether there is a potentially meritorious issue in this record. Accordingly, we strike the filed *Anders* brief and order appointed appellate

counsel to file a new brief. *See Arevalos v. State*, 606 S.W.3d 912, 916 (Tex. App.—Dallas 2020, no pet.).

CONCLUSION

As to Mother, we affirm the trial court's Order of Termination.

As to Father, by separate order, we strike the brief filed on Father's behalf in this case. We order Father's appellate counsel, within thirty days of the date of this opinion, to either (1) file a brief that addresses arguable issues found within the record, or (2) if, after a thorough and professional review of the record, counsel identifies no such arguable issues, file an *Anders* brief that complies with the requirements of *High*, 573 S.W.2d at 813. Any motion for extension of time to comply with our order will be looked upon with disfavor.

<table>
<tr><td></td><td>/Erin A. Nowell//</td></tr>
<tr><td>220341f.p05</td><td>ERIN A. NOWELL<br>JUSTICE</td></tr>
</table>



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF A.C., A CHILD

No. 05-22-00341-CV

On Appeal from the County Court At Law No. 1, Kaufman County, Texas Trial Court Cause No. 107543-CC. Opinion delivered by Justice Nowell. Justices Partida-Kipness and Pedersen, III participating.

In accordance with this Court's opinion of this date, as to the Mother of the child, A.C., we **AFFIRM** the trial court's Order of Termination.

Judgment entered this 4th day of October 2022.